# MARSHALL, SECRETARY OF LABOR, ET AL. v. JERRICO, INC.

No. 79–253.   Argued March 19, 1980—Decided April 28, 1980

MARSHALL, J., delivered the opinion for a unanimous Court.

*Deputy Solicitor General Geller* argued the cause for appellants. With him on the briefs was *Solicitor General McCree.*

*Thomas W. Power* argued the cause for appellee. With him on the brief were *William E. Anderson* and *Curtis L. Wilson.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Under § 16 (e) of the Fair Labor Standards Act, 29 U. S. C. § 216 (e), sums collected as civil penalties for the unlawful employment of child labor are returned to the Employment Standards Administration (ESA) of the Department of Labor in reimbursement for the costs of determining violations and assessing penalties. The question for decision is whether this provision violates the Due Process Clause of the Fifth Amendment by creating an impermissible risk of bias in the Act's enforcement and administration.

I

The child labor provisions of federal law are primarily contained in § 12 of the Fair Labor Standards Act, 52 Stat. 1067, as amended, 29 U. S. C. § 212. The Secretary of Labor has designated the ESA as the agency responsible for enforcing these provisions, 36 Fed. Reg. 8755 (1971). The ESA in turn carries out its responsibilities through regional offices, and the assistant regional administrator of each office has been charged with the duty of determining violations and assessing penalties.

Appellee Jerrico, Inc., is a Delaware corporation that manages approximately 40 restaurants in Kentucky, Indiana, Tennessee, Georgia, and Florida. In a series of investigations from 1969 to 1975, the ESA uncovered over 150 violations of the child labor provisions at appellee's various establishments. After considering the factors designated by statute and regulations,[1] the ESA Assistant Regional Administrator in the Atlanta office assessed a total fine of $103,000 in civil penalties for the various violations. That figure included a supplemental assessment of $84,500 because of his conclusion that the violations were willful.

Appellee filed exceptions to the determination and assessment of the Assistant Regional Administrator, and pursuant to 29 U. S. C. § 216 (e), a hearing was held before an Administrative Law Judge. Witnesses included employees of appellee and representatives of the Department of Labor. The Administrative Law Judge accepted the Assistant Regional Adminis-

---

[1] Those factors include "any history of prior violations; any evidence of willfulness or failure to take reasonable precautions to avoid violations; the number of minors illegally employed; the age of the minors so employed and records of the required proof of age; the occupations in which the minors were so employed; exposure of such minors to hazards and any resultant injury to such minors; the duration of such illegal employment; and, as appropriate, the hours of the day in which it occurred and whether such employment was during or outside school hours." 29 CFR § 579.5 (c) (1979).

trator's contention that violations had occurred, concluding that the record showed "a course of violations" for which "[r]espondent's responsibility cannot be disputed." At the same time, he was persuaded by appellee's witnesses and by a review of the evidence that the violations were not willful. Accordingly, he reduced the total assessment to $18,500.

Appellee did not seek judicial review of the decision of the Administrative Law Judge. Instead, it brought suit in Federal District Court, challenging the civil penalty provisions of the Act on constitutional grounds and seeking declaratory and injunctive relief against their continued enforcement. Appellee accepted the determination of the Administrative Law Judge and alleged no unfairness in the proceedings before him. Nonetheless, it contended that § 16 (e) of the Act violated the Due Process Clause of the Fifth Amendment by providing that civil penalties must be returned to the ESA as reimbursement for enforcement expenses and by allowing the ESA to allocate such fines to its various regional offices. According to appellee, this provision created an impermissible risk and appearance of bias by encouraging the assistant regional administrator to make unduly numerous and large assessments of civil penalties.

After the parties engaged in discovery with respect to the administration of § 16 (e), appellee moved for summary judgment. The District Court granted the motion. It acknowledged that the Office of Administrative Law Judges was unaffected by the total amount of the civil penalties. At the same time, the court concluded that the reimbursement provision created an impermissible risk of bias on the part of the assistant regional administrator. Citing *Tumey* v. *Ohio*, 273 U. S. 510 (1927), and *Ward* v. *Village of Monroeville*, 409 U. S. 57 (1972), the court found that because a regional office's greater effort in uncovering violations could lead to an increased amount of penalties and a greater share of reimbursements for that office, § 16 (e) could distort the assistant regional administrator's objectivity in assessing penal-

ties for violations of the child labor provisions of the Act.

We noted probable jurisdiction, 444 U. S. 949 (1979), and now reverse.

## II

### A

The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process. See *Carey* v. *Piphus*, 435 U. S. 247, 259–262, 266–267 (1978). The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. See *Mathews* v. *Eldridge*, 424 U. S. 319, 344 (1976). At the same time, it preserves both the appearance and reality of fairness, "generating the feeling, so important to a popular government, that justice has been done," *Joint Anti-Fascist Committee* v. *McGrath*, 341 U. S. 123, 172 (1951) (Frankfurter, J., concurring), by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.

The requirement of neutrality has been jealously guarded by this Court. In *Tumey* v. *Ohio, supra,* the Court reversed convictions rendered by the mayor of a town when the mayor's salary was paid in part by fees and costs levied by him acting in a judicial capacity. The Court stated that the Due Process Clause would not permit any "procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused." 273 U. S., at 532. *Tumey* was applied in *Ward* v. *Village of Monroeville, supra,*

to invalidate a procedure by which sums produced from a mayor's court accounted for a substantial portion of municipal revenues, even though the mayor's salary was not augmented by those sums. The forbidden "possible temptation," we concluded, is also present "when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court." 409 U. S., at 60. We have employed the same principle in a variety of settings, demonstrating the powerful and independent constitutional interest in fair adjudicative procedure.[2] Indeed, "justice must satisfy the appearance of justice," *Offutt v. United States*, 348 U. S. 11, 14 (1954), and this "stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties," *In re Murchison*, 349 U. S. 133, 136 (1955). See also *Taylor v. Hayes*, 418 U. S. 488 (1974).

Appellee contends that these principles compel the conclusion that the reimbursement provision of the Act violates the Due Process Clause. We conclude, however, that the strict requirements of *Tumey* and *Ward* are not applicable to the determinations of the assistant regional administrator, whose functions resemble those of a prosecutor more closely than those of a judge. The biasing influence that appellee discerns in § 16 (e) is, we believe, too remote and insubstantial to violate the constitutional constraints applicable to the deci-

---

[2] For example, we have invalidated a system in which justices of the peace were paid for issuance but not for nonissuance of search warrants, *Connally v. Georgia*, 429 U. S. 245 (1977) (*per curiam*); prohibited the trial of a defendant before a judge who has previously held the defendant in contempt, *Taylor v. Hayes*, 418 U. S. 488 (1974); *Mayberry v. Pennsylvania*, 400 U. S. 455 (1971); forbidden a state administrative board consisting of optometrists in private practice from hearing charges filed against licensed optometrists competing with board members, *Gibson v. Berryhill*, 411 U. S. 564, 578–579 (1973); and prohibited a parole officer from making the determination whether reasonable grounds exist for the revocation of parole, *Morrissey v. Brewer*, 408 U. S. 471, 485–486 (1972).

sions of an administrator performing prosecutorial functions. To explain our conclusion, we turn to the relevant sections of the Act.

As noted above, the major portions of the federal child labor provisions appear in 29 U. S. C. § 212, which outlaws the employment in interstate commerce of "oppressive child labor," as that term is defined in 29 U. S. C. § 203 (*l*) and implementing regulations. These provisions demonstrate a firm federal policy of "protect[ing] the safety, health, well-being, and opportunities for schooling of youthful workers." 29 CFR § 570.101 (1979). See also H. R. Rep. No. 1452, 75th Cong., 1st Sess., 6 (1937); S. Rep. No. 884, 75th Cong., 1st Sess., 2, 6 (1937).

Before 1974, the Secretary of Labor enforced the child labor provisions primarily through actions for injunctive relief, see 29 U. S. C. §§ 212 (b), 217, and for criminal sanctions, see 29 U. S. C. §§ 216 (a), 215 (a)(4). Having found such relief to be an inadequate or insufficiently flexible remedy for violations of the law, cf. H. R. Rep. No. 93–913, p. 15 (1974), Congress in 1974 authorized the Secretary to assess a civil penalty not to exceed $1,000 for each violation of § 212. 29 U. S. C. § 216 (e). Under this provision for the assessment of civil penalties, the Secretary's determination of the existence of a violation and of the amount of the penalty is not final if the person charged with a violation enters an exception within 15 days of receiving notice. In the event that such an exception is entered, the final determination is made in an administrative hearing conducted in accordance with the Administrative Procedure Act, 5 U. S. C. § 554. The administrative law judge "may affirm, in whole or in part, the determination by the Administrator of the occurrence of violations or . . . may find that no violations occurred, and shall order payment of a penalty in the amount originally assessed or in a lesser amount . . . or order that respondent pay no penalty, as appropriate." 29 CFR § 580.32 (a) (1979). He is directed to consider the same factors considered by the assistant re-

gional administrator[3] in making his original assessment. *Ibid.* Under the natural construction of this regulation, the administrative law judge is required to conduct a *de novo* review of all factual and legal issues.[4]

The provision whose constitutionality is at issue in this case is a part of 29 U. S. C. § 216 (e), the civil penalty section of the Act. That provision states that civil penalties collected for violations of the child labor law "shall be applied toward reimbursement of the costs of determining the violations and assessing and collecting such penalties, in accordance with the provisions of section 9a of this title." Section 9a, 29 U. S. C. § 9a, added in 1934, provides in turn that all sums

> "received by the Department of Labor in payment of the cost of such work shall be deposited to the credit of the appropriation of that bureau, service, office, division, or other agency of the Department of Labor which supervised such work, and may be used, in the discretion of the Secretary of Labor, and notwithstanding any other provision of law, for the ordinary expenses of such agency and/or to secure the special services of persons who are neither officers nor employees of the United States."[5]

The record developed in the District Court permits a detailed description of the administration of the reimbursement provision in the years 1976, 1977, and 1978. It is plain that no official's salary is affected by the levels of the penalties. In all three years the sums collected as child labor penalties amounted to substantially less than 1% of the ESA's budget.[6]

---

[3] See n. 1, *supra.*

[4] See n. 9, *infra,* and accompanying text.

[5] The section was originally designed "[t]o authorize the Department of Labor to make special statistical studies upon payment of the cost thereof, and for other purposes." See 48 Stat. 582; S. Rep. No. 322, 73d Cong., 2d Sess. (1934).

[6] In 1976, the ESA collected about $151,000 in child labor penalties; in 1977, $650,000; and in 1978, $592,000. By comparison, $87,407,000 was

And in each of those years, the ESA did not spend the full amount appropriated to it, and the sums that were not spent were returned to the Treasury. The amounts returned to the Treasury in that fashion substantially exceeded the sums collected under § 16 (e) in all three years.[7] The challenged provisions have not, therefore, resulted in any increase in the funds available to the ESA over the amount appropriated by Congress.

Civil penalties for child labor violations are allocated by the national office of the ESA, subject to the approval of the Secretary of Labor. In 1976, the sums collected were allocated to and retained by the ESA national office; in 1977, they were allocated to the national office, to the Office of the Solicitor of Labor, and to the various regional offices in proportion to the amounts expended on enforcement of the child labor provisions;[8] and in 1978, the penalties were held in the Treasury. Civil penalties have never been allotted to the regional offices on the basis of the total amount of penalties collected by particular offices.

The District Court concluded that in these circumstances the challenged provision violated the Due Process Clause under the principles set forth in *Tumey* and *Ward*. It noted that, as the 1977 practice demonstrated, the ESA has discretion to return sums collected as civil penalties to the regional offices in proportion to the amounts expended on enforcement efforts. Increased enforcement costs could thus lead to a

---

appropriated to the ESA in 1976; $98,992,000 in 1977; and $119,632,000 in 1978. See Budget of the United States Government, Fiscal Year 1980—Appendix 652; Budget of the United States Government, Fiscal Year 1979—Appendix 623–624; Budget of the United States Government, Fiscal Year 1978—Appendix 510.

[7] The record indicates that, in 1976, the ESA returned $981,000 to the Treasury; $870,000 was returned in 1977; and $4,600,000 in 1978.

[8] In that year a total of $559,800 was allotted, including $194,800 to the national office. The Chicago office received $44,300, the highest allotment of any regional office; the Denver office received the lowest, $4,900.

larger share of reimbursements. According to the court, an assistant regional administrator would therefore be inclined to maximize the total expenditures on enforcement of the child labor provisions of the Act, and those increased expenditures would result in an increase in the number and amount of penalties assessed. The court concluded that this possibility created an unconstitutional risk of bias in the assistant regional administrator's enforcement decisions. We disagree.

The assistant regional administrator simply cannot be equated with the kind of decisionmakers to which the principles of *Tumey* and *Ward* have been held applicable. He is not a judge. He performs no judicial or quasi-judicial functions. He hears no witnesses and rules on no disputed factual or legal questions. The function of assessing a violation is akin to that of a prosecutor or civil plaintiff. If the employer excepts to a penalty—as he has a statutory right to do—he is entitled to a *de novo* hearing before an administrative law judge.[9] In that hearing the assistant regional administrator acts as the complaining party and bears the burden of proof on contested issues. 29 CFR § 580.21 (a) (1979). Indeed,

---

[9] Appellee claims that the hearing before the administrative law judge is not truly *de novo* because the judge has the authority only to determine the existence of the violation, not to assess the reasonableness of the penalty. We are unable to discern any such limitation on the administrative law judge's authority. Under federal regulations, the administrative law judge is expressly empowered to review the amount of the penalty and is required to consider precisely those factors considered by the assistant regional administrator in making his assessment. See 29 CFR § 579.5 (1979). Indeed, in this very case the Administrative Law Judge carefully reviewed the Assistant Regional Administrator's assessment and reduced it by over 80%.

Appellee correctly points out that in *Ward* v. *Village of Monroeville*, 409 U. S. 57 (1972), we held that the availability of a trial *de novo* before an unbiased judge did not remove the constitutional infirmity in an original trial before one whose impartiality was impaired. A litigant, we said, "is entitled to a neutral and detached judge in the first instance." *Id.*, at 61–62. *Ward* does not aid appellee in this case, however, for the administrative law judge presides over the initial adjudication.

the Secretary's regulations state that the notice of penalty assessment and the employer's exception "shall, respectively, be given the effect of a complaint and answer thereto for purposes of the administrative proceeding." 29 CFR § 580.3 (b) (1979). It is the administrative law judge, not the assistant regional administrator, who performs the function of adjudicating child labor violations. As the District Court found, the reimbursement provision of § 16 (e) is inapplicable to the Office of Administrative Law Judges.[10]

The rigid requirements of *Tumey* and *Ward,* designed for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a prosecutorial or plaintiff-like capacity. Our legal system has traditionally accorded wide discretion to criminal prosecutors in the enforcement process, see *Linda R. S.* v. *Richard D.,* 410 U. S. 614 (1973), and similar considerations have been found applicable to administrative prosecutors as well, see *Moog Industries, Inc.* v. *FTC,* 355 U. S. 411, 414 (1958); *Vaca* v. *Sipes,* 386 U. S. 171, 182 (1967). Prosecutors need not be entirely "neutral and detached," cf. *Ward* v. *Village of Monroeville,* 409 U. S., at 62. In an adversary system, they are necessarily permitted to be zealous in their enforcement of the law. The constitutional interests in accurate finding of facts and application of law, and in preserving a fair and open process for decision, are not to the same degree implicated if it is the prosecutor, and not the judge, who is offered an incentive for

---

[10] Appellee errs in suggesting that the Office of Administrative Law Judges is also entitled to reimbursement under § 16 (e). When read in conjunction with 29 U. S. C. § 9 (a), that section allows reimbursement to offices that "supervised [the] work" of "determining the violations and assessing and collecting [the] penalties." The Office of Administrative Law Judges does not "supervise" that work. Indeed, the Administrative Procedure Act expressly forbids such supervision. 5 U. S. C. § 554 (d). The Office of Administrative Law Judges maintains an administrative section within the Department of Labor entirely separate from that of the supervising body, the ESA, and the Office has a separate budget.

securing civil penalties. The distinction between judicial and nonjudicial officers was explicitly made in *Tumey*, 273 U. S., at 535, where the Court noted that a state legislature "may, and often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the State and the people." See also *Hortonville School Dist.* v. *Hortonville Ed. Assn.*, 426 U. S. 482, 495 (1976).

We do not suggest, and appellants do not contend, that the Due Process Clause imposes no limits on the partisanship of administrative prosecutors. Prosecutors are also public officials; they too must serve the public interest. *Berger* v. *United States*, 295 U. S. 78, 88 (1935). In appropriate circumstances the Court has made clear that traditions of prosecutorial discretion do not immunize from judicial scrutiny cases in which the enforcement decisions of an administrator were motivated by improper factors or were otherwise contrary to law. See *Dunlop* v. *Bachowski*, 421 U. S. 560, 567, n. 7, 568–574 (1975); *Rochester Telephone Corp.* v. *United States*, 307 U. S. 125 (1939).[11] Moreover, the decision to enforce—or not to enforce—may itself result in significant burdens on a defendant or a statutory beneficiary, even if he is ultimately vindicated in an adjudication. Cf. 2 K. Davis, Administrative Law Treatise 215–256 (2d ed. 1979). A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some

---

[11] Cf., *e. g.*, *Adams* v. *Richardson*, 156 U. S. App. D. C. 267, 480 F. 2d 1159 (1973); *Environmental Defense Fund, Inc.* v. *Ruckelshaus*, 142 U. S. App. D. C. 74, 439 F. 2d 584 (1971); *Medical Comm. for Human Rights* v. *SEC*, 139 U. S. App. D. C. 226, 432 F. 2d 659 (1970), vacated as moot, 404 U. S. 403 (1972); *Perez* v. *Boston Housing Authority*, 379 Mass. 703, ——–—, ——–—, 400 N. E. 2d 1231, 1247, 1252–1253 (1980). See Stewart, The Reformation of American Administrative Law, 88 Harv. L. Rev. 1667, 1752–1756 (1975); Jaffe, The Individual Right to Initiate Administrative Process, 25 Iowa L. Rev. 485 (1940).

contexts raise serious constitutional questions. See *Borden-kircher* v. *Hayes,* 434 U. S. 357, 365 (1978); cf. 28 U. S. C. § 528 (1976 ed., Supp. III) (disqualifying federal prosecutor from participating in litigation in which he has a personal interest). But the strict requirements of neutrality cannot be the same for administrative prosecutors as for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime.

## B

In this case, we need not say with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function,[12] for here the influence alleged to impose bias is exceptionally remote. No governmental official stands to profit economically from vigorous enforcement of the child labor provisions of the Act. The salary of the assistant regional administrator is fixed by law. 5 U. S. C. § 5332 (1976 ed. and Supp. III). The pressures relied on in such cases as. *Tumey* v. *Ohio, supra; Gibson* v. *Berryhill,* 411 U. S. 564, 579 (1973); and *Connally* v. *Georgia,* 429 U. S. 245, 250 (1977) (*per curiam*), are entirely absent here.

Nor is there a realistic possibility that the assistant regional administrator's judgment will be distorted by the prospect of institutional gain as a result of zealous enforcement efforts. As we have noted, the civil penalties collected under § 16 (e) represent substantially less than 1% of the budget of the ESA.[13] In each of the relevant years, the amount of the ESA's

---

[12] In particular, we need not say whether different considerations might be held to apply if the alleged biasing influence contributed to prosecutions against particular persons, rather than to a general zealousness in the enforcement process.

[13] Even if the ESA received a considerable amount in civil penalties in a particular year, of course, it is possible that Congress would decide to appropriate a correspondingly lower amount from the Treasury.

budget that was returned to the Treasury was substantially greater than the amount collected as civil penalties. Unlike in *Ward* and *Tumey,* it is plain that the enforcing agent is in no sense financially dependent on the maintenance of a high level of penalties. Furthermore, since it is the national office of the ESA, and not any assistant regional administrator, that decides how to allocate civil penalties, such administrators have no assurance that the penalties they assess will be returned to their offices at all. See *Dugan* v. *Ohio,* 277 U. S. 61 (1928).

Moreover, the ESA's administration of the Act has minimized any potential for bias. In the only year in which the ESA elected to allocate part of the civil penalties to the regional offices, it did so in proportion to the expenses incurred in investigating and prosecuting child labor violations, not on the basis of the amounts of penalties collected. Thus, even if an assistant regional administrator were to act on the assumption that civil penalties would be returned to his office in any given year, his decision to assess an unjustifiably large penalty in a particular case would be of no benefit to his office, since that decision would not produce an increase in the level of expenses.

The District Court's conclusion that the reimbursement provision violated the Due Process Clause was evidently premised on its perception that an assistant regional administrator might be tempted to devote an unusually large quantity of resources to enforcement efforts in the hope that he would ultimately obtain a higher total allocation of federal funds to his office. This increase in enforcement effort, the court suggested, might incline the assistant regional administrator to assess an unjustified number of penalties, and to make those penalties unduly high. But in light of the factors discussed above, it is clear that this possibility is too remote to violate the constraints applicable to the financial or personal interest of officials charged with prosecutorial or plain-

tiff-like functions.[14]   In order to produce the predicted result, the ESA would be required to decide to allocate civil penalties to regional offices; the sums allocated to the particular regional office would have to exceed any amount of that office's budget returned to the Treasury at the end of the fiscal year; the assistant regional administrator would have to receive authorization from his superiors to expend additional funds to increase his enforcement expenditures to the desired level; the increased expenditures would have to result in an increase in penalties; and the administrative law judge and reviewing courts would have to accept or ratify the assistant regional administrator's assessments.   "[U]nder a realistic appraisal of psychological tendencies and human weakness," *Withrow* v. *Larkin,* 421 U. S. 35, 47 (1975), it is exceedingly improbable that the assistant regional administrator's enforcement decisions would be distorted by some expectation that all of these contingencies would simultaneously come to fruition.   We are thus unable to accept appellee's contention that, on this record and as presently administered, the reimbursement provision violates standards of procedural fairness embodied in the Due Process Clause.

The judgment of the District Court is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

---

[14] We need not, of course, say whether the alleged biasing influence is too remote to raise constitutional objections even under the standards of *Ward* and *Tumey*.