# Proposed Legislation to Establish the
# National Indian Gaming Commission

A bill that proposes to create an "independent commission" within the Department of the Interior to regulate gambling on Indian reservations and that would give the commission the power, *inter alia*, to impose civil fines, gives rise to several constitutional issues. The extent to which Congress may restrict the removal of subordinate executive officers such as the members of the Indian Gaming Commission is unclear, but such restrictions should be avoided. Furthermore, consistent with the Appointments Clause, the authority to waive a federal statute should be subject to the approval of a principal officer, such as the Secretary of the Interior.

Under the Due Process Clause, civil penalties imposed by members of the Indian Gaming Commission should be imposed by an unbiased administrative judge rather than an interested official.

Under the Fourth Amendment, the Indian Gaming Commission may conduct warrantless searches of gambling establishments, which are part of a closely regulated industry, only if: (1) there is a substantial government interest; (2) the searches are necessary to further the regulatory scheme; and (3) the statute provides a constitutionally adequate substitute for a warrant. The first and second requirements are met in this case. The third requirement may be met by providing notice in the statute that inspections will be made on a regular basis and will have a particular scope.

July 24, 1987

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL,
LAND AND NATURAL RESOURCES DIVISION

This responds to your request for our views on S. 1303, a bill that would establish a National Indian Gaming Commission (Commission) within the Department of the Interior to regulate gambling on Indian reservations. We have several comments.

First, the Commission is established as "an independent commission" within the Department of the Interior. S. 1303, § 5(a). As a part of the Department of the Interior, the Commission is subordinate to the Secretary of the Interior and cannot be independent of that authority. Section 5(b)(5) states that the four members appointed by the Secretary may only be removed for cause. The extent of Congress' power to place limitations on the removal of subordinate executive officers is unclear,[1] and in this context, should be avoided. The Secretary is responsible for the actions of the Commission's members, a majority of whom he appoints, and will be charged with defending them if they are sued or act in a controversial fashion. Limiting his removal power will

---

[1] *Cf. United States* v. *Perkins*, 116 U.S. 483 (1886).

handicap his supervisory authority. This is especially important given that the Commission is acting in an area that will undoubtedly attract criminals and subject the Commissioners to a variety of pressures. If enacted as is, we would read the "for cause" provision broadly, in order to give the Secretary maximum flexibility. To provide the Secretary with adequate authority to supervise the Commission's members, however, we urge that he be given the clear right to remove the members at will.

Second, § 4, which prohibits gaming on certain Indian lands, does not apply "if the Indian tribe . . . obtains the concurrence of the Governor of the State, and the governing bodies of the county or municipality in which such lands are located" to the tribe's obtaining the land. *Id.*, § 4(b). This provision would give individuals not appointed in accordance with the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, the authority to waive a federal statute. In order to avoid the constitutional problems inherent in such a situation, § 4(b) should be revised to begin: "Subject to the approval of the Secretary." This would insure that implementation of the statute remained in the hands of a properly appointed Executive Branch officer.

Third, we are concerned by § 15(a)(1), which permits the Chairman of the Commission to levy civil fines of up to $25,000 against the managers of the gambling establishments.[2] "Fines collected pursuant to this section shall be utilized by the Commission to defray its operating expenses." *Id.*[3] The use of civil penalties to supplement the Commission's appropriation raises due process concerns. The Due Process Clause requires that such fines be assessed by a neutral tribunal. *Ward* v. *Monroeville*, 409 U.S. 57, 62 (1972). Although it is true that Commission members will not benefit personally from any civil fines imposed,[4] the provision raises questions about how impartial the Chairman will be in levying fines when he knows the proceeds will be applied directly to the "operating expenses" of the Commission.

The Supreme Court addressed this issue most recently in *Marshall* v. *Jerrico, Inc.*, 446 U.S. 238 (1980).[5] In upholding the assessment provision at issue in *Marshall*, the Court highlighted several factors. First, the Court noted that the regional administrator levying the fine did not have the role of a judge, as in *Ward* and *Tumey*, but was akin to a prosecutor. Prosecutors, the Court said, need not be entirely neutral and detached, as judges must be. *Marshall*, 446 U.S. at 248. The regional administrator had the role of a prosecutor because the employer was "entitled to a *de novo* hearing before an administrative law judge," where the administrator would have to prove his case. *Id.* at 247. Thus, the first level of *adjudication* (rather than accusation) was before an unbiased judge.

---

[2] The manager may have the Commission hear the evidence against him before the fine is collected by the Chairman. S. 1303, § 15(a)(2).

[3] Operating expenses are not defined.

[4] *See Tumey* v. *Ohio*, 273 U.S. 510, 523 (1927).

[5] *Marshall* involved the power of a Department of Labor regional administrator to assess a civil penalty of up to $1000 against employers who violated the child labor laws. The penalties collected in each region were returned to the national office, which allocated them for various parts of the program, including the regional offices. The statute was challenged on the ground that regional administrators would assess extra fines in the hope that some of the money would be returned to their regions.

By contrast, under S. 1303 the Chairman (and the Commission) are not analogous to prosecutors: they do not have to prove their case before an independent administrative law judge. The Chairman's decision to levy a fine is reviewed not by an independent administrative law judge but by the Commission, which is as interested in the matter as the Chairman. Thus, the Chairman and the Commission constitute the initial level of adjudication for the owners. The next level of adjudication is in the court of appeals. S. 1303, § 16. The *Marshall* opinion seems to indicate that if a financially interested administrator acts as a judge, the "rigid requirements of *Tumey* and *Ward*, designed for officials performing judicial or quasi-judicial functions" apply. *Marshall*, 446 U.S. at 248.

Moreover, the Court in *Marshall* emphasized that the penalties collected by the regional administrators constituted "substantially less than 1%" of the agency's budget. *Id.* at 245. In fact, the agency returned money each year to the Department of the Treasury because it was not even using up its appropriation, so that the collection of penalties did not "resul[t] in any increase in the funds available to the [agency] over the amount appropriated by Congress." *Id.* at 246. In light of these figures, the Court did not believe that there was "a realistic possibility that the [administrator's] judgment will be distorted by the prospect of institutional gain as a result of zealous enforcement efforts." *Id.* at 251. The Commission's initial appropriation is $2,000,000. S. 1303, § 20. We cannot say at this point how much money the Commission will collect in penalties, but there is certainly a significant possibility that the Commission may generate more than 1 percent of its operating expenses from assessing penalties of up to $25,000 per offense.

As the Supreme Court has said, one of the most important functions served by having an impartial and disinterested judge is the preservation of a fair adjudicative *process*: "Indeed, 'justice must satisfy the appearance of justice.'" *Marshall*, 446 U.S. at 243 (citation omitted). While we cannot state definitively whether the penalty provision in S. 1303 would survive court scrutiny, we do believe it would provide a serious ground for attack. We would therefore recommend that this provision be eliminated. If it is not, we recommend that the amount of money collected be used as a credit against the Commission's appropriation, rather than as a supplement to it, or that some cap be placed on the amount that the Commission may retain.

Our next concern with the bill is that it would permit the Commission to inspect the premises and records of any establishment where gambling is conducted. S. 1303, § 7(b)(2), (4). As we noted last year when commenting on an earlier version of this bill,[6] the Supreme Court has recognized the applicability of the Fourth Amendment to commercial enterprises, but has created certain exceptions: first, for closely regulated industries in which owners have reduced expectations of privacy; and second, for laws providing such a regular and certain pattern of inspections that there is a predictable and guided federal

---

[6] Memorandum for Stephen S Trott, Assistant Attorney General, Criminal Division from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel (Apr 1, 1986).

regulatory presence.[7] The Supreme Court has held that closely regulated indus-tries include the liquor trade, firearms, mining, and, in its most recent decision in this area, automobile junkyards. *New York* v. *Burger*, 482 U.S. 691 (1987). We think it is fair to assume that gambling would be considered a closely regulated industry in the United States.

In *Burger*, the Supreme Court held that warrantless inspections of closely regulated industries are permissible if three criteria are met. First, there must be a substantial federal interest at stake. *Id*. at 702. Regulation of gambling on Indian reservations in order to prevent the infiltration of organized crime is certainly an important federal interest. Second, warrantless inspections must be necessary to further the regulatory scheme. *Id*. As with the scheme upheld in *Burger*, effective inspections of gambling establishments require surprise. Otherwise, the owners would have ample time to hide or destroy ledgers or other evidence of malfeasance. Third, the statute must provide "a 'constitution-ally adequate substitute for a warrant.'" *Id*. at 703 (quoting *Donovan* v. *Dewey*, 452 U.S. 594, 603 (1981)). In *Burger*, this condition was met because:

> [t]he statute informs the operator of a vehicle dismantling busi-ness that inspections will be made on a regular basis. Thus [he] knows that the inspections . . . do not constitute discretionary acts by a government official but are conducted pursuant to statute. [The statute] also sets forth the scope of the inspection and, accordingly, places the operator on notice as to how to comply with the statute.

*Id*. at 711 (citations omitted). The only restraint on the scope of the inspection identified by the Court was limiting the inspections to regular business hours. *Id*.

S. 1303 puts the operators of gambling establishments on notice that they will be inspected and lists the items that are subject to inspection, thus placing operators on notice as to the scope of what can be examined. Accordingly, our only suggestion is that the bill be amended to state that inspections will take place during regular business hours.[8]

DOUGLAS W. KMIEC
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[7] *See Donovan* v. *Dewey*, 452 U.S. 594, 598 (1981); *Marshall* v. *Barlow's Inc.*, 436 U.S. 307, 311 (1978); *United States* v. *Biswell*, 406 U.S. 311, 313 (1972); *Colonnade Catering Corp.* v. *United States*, 397 U.S. 72, 75 (1970); *See* v. *City of Seattle*, 387 U.S. 541, 542 (1967).

[8] Earlier cases such as *Donovan* also required inspections on more than an annual basis: *Donovan* upheld a statutory scheme in part because it provided for irregular inspections at least twice a year. 452 U.S. at 604. *Burger* does not appear to insist on this factor, but such a provision would provide further protection against constitutional attack.