Rel: March 20, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2025-2026

_____

### CL-2025-0748
_____

### Shawn Barnett

### v.

### Brooklyn Barnett

### Appeal from Winston Circuit Court
### (DR-25-14)

EDWARDS, Judge.

In June 2025, Brooklyn Barnett filed in the Winston Circuit Court ("the trial court") a petition pursuant to Ala. Code 1975, § 30-5-1 et seq. ("the PFA statute"), seeking a protection-from-abuse ("PFA") order against her father, Shawn Barnett. In her petition, Brooklyn alleged that

Shawn had charged at her from more than 50 yards away, had threatened to beat her to death, and had threatened to burn down her house. She further alleged that Shawn had kept "showing up" and threatening to kick her out. She described him as a "substance abuser that is very aggressive." Brooklyn also checked boxes on the form petition indicating that Shawn had "recklessly engaged in conduct which risked serious injury to the plaintiff" and that he had "made [her] afraid that [she] would be seriously injured." She also checked the box on the form petition indicating that he had trespassed on her property; however, she also checked a box on the form petition indicating that she and Shawn were joint owners of the property. Brooklyn indicated that Shawn's behavior had begun in November 2024, over six months before she filed the PFA petition. In addition to seeking a PFA order restraining Shawn from harassing her, she indicated that Theresa Haynes also required protection from Shawn.

The trial court entered an ex parte PFA order on June 26, 2025.[1] Shawn was served with the ex parte PFA order and petition on June 29, 2025. On July 7, 2025, Shawn, appearing through his attorney,

---

[1]That order did not include Haynes as a protected person.

requested a hearing on the PFA petition. The trial court set a trial to be held on July 18, 2025.

After the conclusion of the trial, the trial court, on July 22, 2025, entered an order concluding that Brooklyn was entitled to a PFA order against Shawn and made that order effective for one year. The trial court found that Shawn had committed an act of domestic violence against Brooklyn but did not elaborate on the details of the domestic violence. The July 22, 2025, order incorporated the terms of the ex parte PFA order, which the trial court modified to include the following restraining order: "Shawn … is restrained, prohibited and enforced from committing or attempting to commit any act of abuse against Brooklyn …." The provisions of the ex parte PFA order prohibited "physical or violent contact" between Shawn and Brooklyn and excluded Shawn from Brooklyn's residence, regardless of his partial ownership of that residence.

Shawn filed a postjudgment motion directed at the PFA order. In that postjudgment motion, Shawn challenged the order based on what he claimed were due-process violations committed by the trial-court judge during the trial on the PFA action. Specifically, Shawn complained that

3

the trial-court judge had admitted at the trial to having had ex parte communications with Brooklyn at the time she filed the PFA petition; that the trial-court judge had improperly required Shawn to present his defense before requiring Brooklyn to present evidence supporting her PFA petition; that, despite having invoked the rule of sequestration, the trial-court judge had allowed Brooklyn to call Haynes as the final witness although she had remained in the courtroom during the entirety of the trial; and that the trial-court judge had allowed Brooklyn to present evidence of incidents that had not been pleaded in the PFA petition. Shawn also challenged the sufficiency of the evidence in his postjudgment motion. He requested that the PFA order be set aside and that he be granted a new trial before a different judge.

The trial court held a hearing on the postjudgment motion, after which the trial court entered a detailed order denying that motion. The postjudgment order states, in its entirety:

> "When a person seeks a Protection From Abuse (PFA) Order in Winston County, they first go to the Clerk's office to pick up the necessary paperwork. Once the paperwork is filled out, they are instructed by the Clerk's office to go to the Judge's office. The Clerk's office contacts the Judge's office to find out if the judge is available to speak to the Plaintiff. When the Plaintiff arrives at the judge's office, the judge's assistant reviews the paperwork to make sure it is complete.

Once the paperwork is complete the judge meets with the Plaintiff to determine if an order is warranted and to explain to the Plaintiff what will happen from that point forward. No ex parte communications have occurred between the Court and [Brooklyn] other than the conversation that took place the day [Brooklyn] filed the PFA petition.

"On the day of the hearing, [Brooklyn] contacted the Judge's assistant and stated that she was afraid to go into the Courtroom while [Shawn] was in the courtroom. The Court's assistant instructed [Brooklyn] to wait in a room outside the courtroom until the hearing. [Brooklyn's] concern for her safety and the instructions given to her [by the Judge's assistant] were passed on to the Judge.

"Because [Brooklyn] was representing herself and afraid, the Court gave two concessions to [her]. First, the Court started the hearing by asking [Shawn] questions to allow [Brooklyn] some time to settle down and second, the Court allowed [Brooklyn] to call a witness that had been sitting in the courtroom while other witnesses testified even though the rule had been invoked. The Court does not believe [Brooklyn] understood the Court's instruction [regarding the rule]. [Brooklyn's] witness[, Haynes,] had been listed in the PFA Petition as person that needed protection from [Shawn] in addition to [Brooklyn]. [Shawn] was given the opportunity to call witnesses and offer exhibits as well as the opportunity to confront and cross examine witnesses. The order of presentation had no adverse impact on [Shawn's] case. [Shawn] was not denied due process.

"Ore tenus testimony was taken. The Court made its ruling based on the oral testimony as well as the behavior and demeanor of the witnesses. [Brooklyn's] testimony and the testimony of [Haynes, Brooklyn's] aunt, who is also [Shawn's] sister, was much more persuasive and believable than that of [Shawn's] testimony [sic] and the testimony of his two witnesses."

5

Shawn timely appealed the PFA order. In his brief on appeal, Shawn argues that the PFA order should be reversed because, he contends, the trial-court judge denied him due process by engaging in ex parte communications with Brooklyn; by having Shawn present evidence in his defense before requiring Brooklyn to establish proof supporting issuance of a PFA order; and by permitting Haynes to testify, despite the fact that, in violation of the invocation of the rule requiring sequestration of witnesses, she had been present during the entirety of the trial. Shawn also challenges the sufficiency of the evidence supporting the PFA order.

To better address Shawn's arguments, an understanding of the conduct of the trial is necessary. When the trial began, the trial-court judge stated: "I have heard from [Brooklyn] in the case, so I think we will start with [Shawn]." After the trial-court judge swore the parties and required the witnesses to be sequestered pursuant to Rule 615, Ala. R. Evid., the trial-court judge began to examine Shawn.[2] Counsel for Shawn

---

[2]Rule 615, Ala. R. Evid., provides, in pertinent part, that "[a]t the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion."

6

interrupted, and the following exchange between counsel for Shawn and the trial-court judge occurred:

> "[Counsel for Shawn]: Judge, before we start, am I going to have an opportunity to cross-examine and ask questions of my own, or are you going to be asking the questions?
>
> "THE COURT: A little of both.
>
> "[Counsel for Shawn]: And you want to start with [Shawn]?
>
> "THE COURT: I'm going to start.
>
> "[Counsel for Shawn]: And are you just basically saying that you have heard from [Brooklyn] just based on what's been filed?
>
> "THE COURT: Right, since I've heard her side of it, and she can testify and be cross-examined, but we're going to start with him.
>
> "[Counsel for Shawn]: Are you saying, I'm asking, like, you spoke privately with her, or is this based upon the filing of the petition?
>
> "THE COURT: It wasn't private, it was -- well, I guess I did speak privately, it was her. I don't know if anyone else was in the office or not, probably my assistant was in the next office.
>
> "[Counsel for Shawn]: Okay, sir, thank you."

Counsel for Shawn did not lodge any objection or make an oral request at that time that the trial-court judge recuse himself.

7

After the trial-court judge concluded his questioning of Shawn, the trial-court judge stated:

> "[THE COURT]: ... And I guess probably what we will do instead of me trying to remember everything she told me, we'll let her testify and speak for herself, but I've heard her story, and I don't want to go back through that, but I wanted to hear what you had to say.
>
> "THE COURT: Brooklyn, we're going to need to put, you know, what you told me the other day on the record.
>
> "[Brooklyn]: Yes, sir.
>
> "THE COURT: But I was kind of curious as to what he would say without hearing what you said.
>
> "[Brooklyn]: Yeah.
>
> "THE COURT: So I've got his side of that one incident, and there are some question I have for him, but I think it would be better if I just let -- if we let you ask any questions that you might have of him. Anything you want to ask him at this point and we'll probably come back to this again later in the hearing but ….
>
> "[Brooklyn]: I currently do not have any questions.
>
> "THE COURT: Okay.
>
> "[Counsel for Shawn]: Judge, will I be provided an opportunity to ask my client questions?
>
> "THE COURT: Yeah, you will, and as we're working through this, typically on PFAs, they're not -- this is actually the first one I had any side that's represented [by counsel].

8

"...

"THE COURT: I think some of the questions that [I] have are going to relate to Brooklyn's testimony, so now that I've heard from Shawn, I'm going to ask Brooklyn to step up and testify … and we'll come back to you, [Shawn]."

The examination of Brooklyn began by the trial-court judge urging Brooklyn to "tell [the court] what you told me the other day." The trial-court judge then asked: "[S]o, if I remember correctly, didn't you tell me that he has either a substance or alcohol problem?" Brooklyn responded: "That's correct." The trial-court judge's examination continued with the question: "[D]id you tell me that he gets violent sometimes and he's abusive when he is under the influence -- is it just alcohol or other things as far as you know?" Brooklyn answered: "I can confirm alcohol abuse, but I'm uncertain of anything else." The trial-court judge next invited Brooklyn to tell the court about the incident giving rise to the PFA petition and any background she wanted the court to know.

Counsel for Shawn cross-examined Brooklyn and then asked the trial-court judge if he had a preference on the next witness, to which the trial court replied: "Just whoever you want to call." Counsel for Shawn presented two character witnesses and then recalled Shawn. Brooklyn declined to cross-examine Shawn, but the trial-court judge questioned

Shawn again. After the conclusion of the trial-court judge's second examination of Shawn, the trial-court judge asked whether there was "anything else from the defense," after which counsel for Shawn replied: "No, Your Honor."

The trial-court judge then invited Brooklyn to state anything she wanted to say on the record or to call any witnesses she would like to call. Brooklyn indicated that she desired to call Haynes, who had been sitting in the courtroom during the entire trial. Counsel for Shawn objected to Haynes's being allowed to testify based on her failure to comply with the sequestration rule. The trial-court judge overruled that objection, stating: "I didn't realize she was going to be a witness. I'm going to allow it. I want to hear what she's going to say."

Shortly after Brooklyn began questioning Haynes, counsel for Shawn made the following objection: "I just want to make an objection just for the record of the procedural order. This wasn't -- I haven't -- I won't be able to present a defense to any of this stuff just from procedural format of this trial." The trial-court judge stated: "Sure." The trial concluded after the conclusion of Haynes's testimony. As previously noted, the trial court entered the PFA order, and Shawn filed a

10

postjudgment motion, in which he requested that the trial court vacate the PFA order and grant him a new trial with a different judge, but that motion was denied.

A majority of Shawn's brief presents argument that the trial-court judge's conduct, in total, deprived him of due process and evidences an appearance of impropriety such that the PFA order should be reversed and a new trial before a different judge should be ordered. Certainly, as Shawn contends, a trial court is required to provide due process to a defendant in a PFA action. See Ex parte C.C., 385 So. 3d 1013, 1016 (Ala. Civ. App. 2023) (explaining that Ala. Code 1975, "§ 30-5-6(a)[,] was designed to protect the due-process rights of defendants in PFA actions"). Generally, due process requires that litigants be permitted the opportunity to present evidence and to cross-examine the witness against them at a trial before an impartial judge. Ex parte James, 713 So. 2d 869, 874 (Ala. 1997) (quoting Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980)) ("'Due [p]rocess ... entitles a person to an impartial and disinterested tribunal in both civil and criminal cases.'"); Crews v. Houston Cnty. Dep't of Pensions & Sec., 358 So. 2d 451, 455 (Ala. Civ. App. 1978) ("[P]rocedural due process contemplates the basic

11

requirements of a fair proceeding including an impartial hearing before a legally constituted court; an opportunity to present evidence and arguments; information regarding the claims of the opposing party; a reasonable opportunity to controvert the opposition's claims; and representation by counsel if it is desired."). As Shawn contends, the trial court's postjudgment order contains admissions indicating that the procedure in Winston County for the institution of a PFA action by a pro se litigant appears to contravene Ala. Code 1975, § 30-5-5(b), which states, in pertinent part, that "[t]he circuit clerk shall not provide assistance to persons in completing the forms or in presenting their case to the court." The fact that the judicial assistant to the judge provides such assistance does not make the conduct permissible. Moreover, Ala. Code 1975, § 30-5-7(a), provides that an ex parte protection order is to be based on the information contained in the petition, see Ex parte C.C., 385 So. 3d at 1016 (observing that "an ex parte PFA order … is [typically] entered solely on the sworn allegations of the plaintiff"), not on ex parte

communications between the petitioner and the judge who might or will preside over the PFA action.[3]

In addition, Canon 3.A.(4), Alabama Canons of Judicial Ethics, states that "[a] judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte communications concerning a pending or impending proceeding." Canon 3.C.(1) requires a judge to disqualify himself or herself "in a proceeding in which … his [or her] impartiality might reasonably be questioned." This court has explained that

> "[t]he test [for disqualification] under that canon is: '"Would a person of ordinary prudence in the judge's position knowing all of the facts known to the judge find that there is a reasonable basis for questioning the judge's impartiality?"' In the Matter of Sheffield, 465 So. 2d 350, 356 (Ala. 1984) (citation omitted)."

---

[3]This is not to say that a trial court may not hold an ex parte hearing, which would be recorded and at which the PFA petitioner would be sworn as a witness, before entering an ex parte PFA order. See, e.g., Ex parte J.C., 165 So. 3d 623, 625 (Ala. Civ. App. 2014) (indicating that an ex parte order was entered "after an ex parte hearing"). However, the record in the present case indicates that the trial-court judge held an informal discussion with Brooklyn in chambers; nothing indicates that Brooklyn was sworn in or that the discussion was recorded.

Bryars v. Bryars, 485 So. 2d 1187, 1189 (Ala. Civ. App. 1986).[4]

A party seeking reversal must establish that the errors of which he or she complains "ha[ve] probably injuriously affected substantial rights of [that party]." Rule 45, Ala. R. App. P. Although the trial court has much discretion over the conduct of trials and the calling of witnesses, see generally Christiansen v. Hall, 567 So. 2d 1338, 1341 (Ala. 1990); Drs. Lane, Bryant, Eubanks & Dulaney v. Otts, 412 So. 2d 254, 259 (Ala. 1982), we share Shawn's concern that the trial court's requiring that he, as the defendant, present the entirety of his defense before Brooklyn presented her entire case could have effected a shift in the burden of proof, which burden was squarely placed on Brooklyn by the PFA statute. See Wu v. Wu, 37 So. 3d 792, 797 (Ala. Civ. App. 2009) (explaining that "[Ala. Code 1975, §] 30-5-6(a)[,] requires the petitioner [in a PFA action] to 'prove the allegation of abuse by a preponderance of the evidence'"). This concern is heightened by the trial court's stated desire to hear from Shawn before Brooklyn established a prima facie case under the PFA

_____

[4]In any event, because the admitted practice of the Winston Circuit Court appears to violate both statutory law and the Canons of Judicial Ethics, which prohibit ex parte communications, this procedure should be discontinued.

statute. See Black v. Ford Motor Co., 600 So. 2d 1029, 1033 (Ala. Civ. App. 1992) (citing C. Gamble, McElroy's Alabama Evidence § 433.01 at 978 (4th ed. 1991)) ("The rules of evidence provide that the proceedings at trial begin with the plaintiff's putting on his case-in-chief followed by the defendant's case or evidence in defense."). Most certainly, the conduct of the trial prejudiced Shawn's ability to rebut the testimony adduced from Haynes.

When we examine the overall conduct of the trial-court judge during the PFA proceeding, we agree with Shawn that reversal of the PFA order is warranted. The trial-court judge's decision to grant what he termed as "concessions" to Brooklyn based on her status as a pro se litigant and her expressed fear of Shawn is troubling. See Boros v. Baxley, 621 So. 2d 240, 243 (Ala. 1993) ("Generally, parties acting pro se should be treated as parties represented by counsel are treated."); Hubbard v. Montgomery, 372 So. 2d 315, 317 (Ala. 1979) ("The Alabama Rules of Civil Procedure are to be applied impartially, and are binding on both members of the bar and parties proceeding pro se."). Although the trial-court judge's decision to permit Brooklyn to call Haynes as a witness was a matter within his discretion, that "concession," combined with both

the trial-court judge's admitted ex parte communication with Brooklyn and his decision to require Shawn to testify first under examination by the trial-court judge so that Brooklyn could "settle down" and because the trial-court judge was, as he stated on the record, "curious as to what [Shawn] would say without hearing what [Brooklyn] said," raise a serious question regarding the appearance of impropriety that would necessitate the trial-court judge's disqualification. The trial-court judge was overly solicitous of Brooklyn's feelings, which evidenced an apparent belief, before testimony began, that Brooklyn had been truthful during her ex parte communication and had a reasonable fear of Shawn, an element Brooklyn was likely required to prove to establish abuse in the PFA action.[5] The trial-court judge's questioning of Brooklyn was also problematic; the trial-court judge began his questioning by asking

---

[5]See Ala. Code 1975, 30-5-2(1), defining the term "abuse" to include, among other things, harassment and menacing. See also Ala. Code 1975, § 13A-11-8(a)(2) (stating that "harassment shall include a threat, verbal or nonverbal, made with the intent to carry out the threat, that would cause a reasonable person who is the target of the threat to fear for his or her safety"), and Ala. Code 1975, § 13A-6-23(a) (stating that a person commits the crime of "menacing" "if, by physical action, he intentionally places or attempts to place another person in fear of imminent serious physical injury").

16

leading questions regarding the statements that Brooklyn apparently made to him during the ex parte communication in his office.

> "As the United States Supreme Court stated in In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955):
>
>> "'A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness.... Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14 [(1954)].'
>
>> "'"An independent and honorable judiciary is indispensable to justice in our society," and this requires avoiding all appearance of impropriety, even to the point of resolving all reasonable doubt in favor of recusal.' In re Sheffield, 465 So. 2d 350, 357 (Ala. 1984) (quoting Canon 1, Alabama Canons of Judicial Ethics).
>
>> "... 'The question is not whether the judge was impartial in fact, but whether another person, knowing all of the circumstances, might reasonably question the judge's impartiality -- whether there is an appearance of impropriety.' [Ex parte] Duncan, 638 So. 2d [1332,] 1334 [(Ala. 1994)]."

Ex parte Atchley, 951 So. 2d 764, 768-69 (Ala. Crim. App. 2006).

We recognize that the trial-court judge indicated that he was basing his decision on the testimony presented at the trial. However, a reasonable person could not help but question the trial-court judge's impartiality based on the information in the record regarding the trial-court judge's conduct during the initiation and trial of Brooklyn's PFA action. Id. Accordingly, we reverse the judgment of the trial court, and we remand the cause with instructions that a new trial be conducted before a different judge.

REVERSED AND REMANDED WITH INSTRUCTIONS.

Moore, P.J., and Hanson, Fridy, and Bowden, JJ., concur.