Kristy SCHWARM, Patricia Foronda, and Josann Ancelet, on behalf of themselves and others similarly situated, Plaintiffs,

v.

Henry CRAIGHEAD, an individual, District Attorney Technical Services, Ltd., a Nevada Corporation, dba Computer Support Services, aka Check Restitution/Prosecution Program, John Q. Lawson, an individual, Mary A. Chase, an individual, and Does 1 through 20, inclusive, Defendants.

No. CIV. 05–01304 WBS GGH.

United States District Court, E.D. California.

May 5, 2008.

1062

Deepak Gupta, Public Citizen Litigation Group, Washington, DC, O. Randolph Bragg, III, Horwitz, Horwitz & Associates, Chicago, IL, Paul Arons, Law Offices of Paul Arons, Friday Harbor, WA, Ronald Wilcox, Ronald Wilcox, Esq., San Jose, CA, Scott Christopher Shoblom, Law Office of Scott Shoblom, Santa Rosa, CA, for Plaintiffs.

Timothy J. Ryan, Ryan & Fong, Sacramento, CA, for Defendants.

Henry Craighead, Fair Oaks, CA, pro se.

*MEMORANDUM AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT*

WILLIAM B. SHUBB, District Judge.

Plaintiffs Kristy Schwarm, Patricia Foronda, and Josann Ancelet filed this class action lawsuit against defendants Henry Craighead, District Attorney Technical Services, Ltd. (DATS), John Q. Lawson, and Mary A. Chase based on defendants' collection efforts. Plaintiffs now move for summary judgment with respect to their claims against Craighead for violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692–1692p, and the procedural due process clauses of the federal and state Constitutions. Craighead subsequently filed a cross-motion for summary judgement with respect to his liability under the FDCPA.

I. *Factual and Procedural Background*[1]

In 1985, the California Legislature enacted the Bad Check Diversion Act (BCDA), Cal.Penal Code §§ 1001.60–1001.67, "to provide a feasible alternative to criminal prosecution by offering bad check writers a chance to pay their debts and clear the incident reports against them without risking criminal prosecution." *del Campo v. Kennedy,* 491 F.Supp.2d 891, 895 (N.D.Cal.2006). After a county authorizes and a district attorney creates a bad check diversion program, the BCDA permits the district attorney to contract with a private entity to "conduct[ ]" the program.[2] Cal.Penal Code § 1001.60.

DATS, which also did business as Computer Support Services (CSS), contracted with twenty-five California district attorneys' offices to administer diversion programs pursuant to the BCDA.[3] (Pls.' Stmt. of Undisputed Facts # 59.) DATS' written contracts with the district attorneys' offices established that DATS would "provide services[ ] as an independent contractor" to the district attorneys' offices in accordance with the BCDA. (Arons Decl. Exs. 19–22.) The contracts also established the percent of the collected fees the district attorneys' offices would receive, whether the particular office was guaranteed a monthly minimum remittance, and that DATS had to indemnify a respective district attorney's office for DATS' actions made pursuant to the contract. (*Id.*)

Craighead was the founder and chief executive officer of DATS. (Arons Decl. Ex. 2 (Craighead's Resp. to Pls.' Interrog. ## 1–2).) He also served as its president from April 14, 1998 through April 17, 2004 and was one of the three members of DATS' Board of Directors, which exercised final authority over DATS' procedures and policies. (*Id.*; Craighead Dep. 11:2–7.) In 1980, Craighead also designed the automated software program DATS used to generate collection letters and track activi-

---

1. Craighead did not specifically oppose plaintiffs' Statement of Undisputed Facts or provide a separate statement as required by Local Rule 56–260. E. Dist. of Cal. Local R. 56–260. Where Craighead's opposition contradicts facts within plaintiffs' Statement of Undisputed Facts, the court will assume he disputes those facts.

Twenty-two days after Craighead filed his reply brief in support of his motion for summary judgment, plaintiffs untimely filed six objections. The court need not address the objections because it did not rely on any of the objectionable evidence.

2. Craighead is not entitled to sovereign immunity based its contracts with the district attorneys' offices. *See del Campo v. Kennedy,* 517 F.3d 1070, 1080–81 (9th Cir.2008) (a private company contracting with a district attorney's office pursuant to the BCDA is not entitled to sovereign immunity).

3. Craighead alleges that, DATS has terminated its operations and no longer operates bad check diversion programs with district attorneys' offices. (Craighead's Mem. in Opp'n to Pls.' Mot. for Summ. J. 13:13–19.)

ty. (Craighead Dep. 144:10–11.) For the entire duration of DATS' operations in California, Craighead independently managed and maintained that program and DATS' computer system. (*Id.* at 20:19–25.) Craighead was also responsible for DATS' marketing and independently negotiated its contracts with district attorneys' offices. (*Id.* at 20:12–13, 140:10–12.) He also oversaw coordination of DATS' diversion classes, distributed monthly payments to the district attorneys' offices, accessed the post office box to which check writers mailed payments, and acted as a signatory for the bank account in which DATS deposited check writers' payments. (Pls.' Stmt. of Undisputed Facts ## 25, 28–30.) Craighead also "regularly interface[d] with clients, victims, and check writers" to accomplish DATS' collection efforts. (Arons Decl. Ex. 2 (Craighead's Resp. to Pls.' Interrog. # 1).)

To initiate its collection efforts, DATS followed uniform practices and procedures throughout the state. (Pls.' Stmt. of Undisputed Facts # 33.) After contracting with a district attorney, DATS established working relationships in which local merchants and Certegy, a check guarantee company, would send bad checks to DATS for collection. (Craighead Dep. 157:1–6.) To participate in a diversion program, a local merchant had to sign a memorandum of understanding, which required the merchant to complete a "Request for Complaint" form in order to submit a bad check to DATS. (Pls.' Stmt. of Undisputed Facts # 36.) The memorandum of understanding also had a line for the merchant to indicate the amount its bank charged for a returned check. (Arons Decl. Ex. 23; Craighead Dep. 101:3–4.) Upon submitting a check to DATS, the local merchant could not pursue independent collection ef-

forts or accept a payment from the check writer. (Arons Decl. Ex. 23.)

When a merchant referred a dishonored check to DATS, it would be entered into DATS' computer system. (Craighead Dep. 28:21–23.) Each week, DATS sent a report of newly entered checks to the appropriate district attorney's office. (*Id.* at 39:8–18.) According to Craighead, it was "very rare" for the respective district attorney's office not to respond to each weekly check entry report. (*Id.* at 39:14–18.) If an office did not respond, Craighead states that DATS contacted the office via telephone and obtained a verbal response from the district attorney's office. (*Id.* at 39:17–18, 23–24.) While the content of a district attorney's office's "response" is unclear,[4] Craighead alleges that DATS "never initiate[d] recovery activity prior to getting some response from a district attorney concerning the check entry report." (*Id.* at 39:19–22.) Somewhat conflicting with his deposition testimony, however, is a cover letter that accompanied a weekly report dated August 23, 2005 in which Craighead stated: "If we have not received a response from your office by September 1, 2005 we will believe that you have reviewed the listing and found no one who is not eligible for the Restitution/Diversion Program and we will proceed with your prescribed restitution procedures." (Arons Decl. Ex. 28.)

Unless a district attorney's office instructed DATS to stop processing a particular check or a merchant requested DATS to terminate its efforts, DATS' computerized system began issuing a series of form collection letters ten days after DATS entered a check into its system. (Craighead Dep. 48:4–18, 49:19–22; *see also* Arons Decl. Ex. 2 at 17 (indicating that Craig-

---

**4.** Craighead only submitted a response letter dated March 10, 2006, which is after plaintiffs filed this lawsuit and the class period closed.

(Craighead Decl. in Supp. of Mot. for Summ. J. Ex. 2.)

head did "not personally send program letters to check writers").) Although the respective district attorney's offices did not review each letter before DATS mailed it, DATS did not draft any of its letters and all were "drafted or approved by a district attorney's office." (Craighead Dep. 40:20–25, 46:15–17, 52:19–22.) DATS also provided its form collection letters to each district attorney's office prior to entering into a contract with the office. (*Id.* at 45:15–17.)

To begin its collection efforts for all of the bad checks it received, DATS used the same three-letter series, which it sent in a pre-determined sequence at pre-programmed intervals. (Pls.' Stmt. of Undisputed Facts # 41.) The four lines of the letterhead for each letter includes: 1) the name and title of the county district attorney for the particular county; 2) the county name; 3) "Check Restitution/Prosecution Program"; and 4) a phone number with a 916 area code, which was DATS' phone number.[5] (Arons Decl. Exs. 2–12, 16.) The signature line indicates that each letter was sent by either the "Program Administrator" or "Administrator." (*Id.* Exs. 2–13, 16.) Some of the letters also indicate the name of the Program Administrator and that the Administrator is part of the "Bad Check Unit." (*Id.*) The letters instructed the check writers to send payments to the Bad or NSF Check Program's P.O. Box in Fair Oaks, California, which was DATS' P.O. Box. (*Id.*) The letters neither reference DATS or CSS nor state that the district attorney's office did not send the letters. (*Id.*)

In DATS' "First Notice," the check writer was told that a "Complaint has been submitted accusing you of a violation of Penal Code Section 476a (Passing a worthless check) by" the listed complainant and that "[t]his office is currently investigating this complaint." (Arons Decl. Ex. 3.) "To suspend this criminal investigation," the letter demanded payment of 1) the check amount, 2) a $35.00 "bad check fee," 3) an $85.00 "diversion fee," and 4) a bank fee of up to $10.00. (*Id.*) The letter gave the check writer the opportunity to avoid the $85.00 diversion fee and waive "MANDATORY attendance at a financial management class" by paying the total amount due within fifteen days. (*Id.* (emphasis in original).) The letter also warned the recipient that failure to respond would "be considered a rejection of this diversion opportunity and may result in further investigation with the possible issuance of a criminal complaint and ARREST warrant." (*Id.* (emphasis in original).) The letter also included the following FDCPA-required language: "As required by 15 USC 1692e, Subdivision 11 of the FDCPA we are providing the following statement; [sic] This is an attempt to collect a debt and any information obtained will be used for that purpose." (*Id.*)

If the check writer did not pay within fifteen days, DATS' computer system generated a second letter on red paper with the title "FINAL NOTICE PRIOR TO REFERRAL FOR POSSIBLE ARREST WARRANT." (Arons Decl. Ex. 4 (emphasis in original); Craighead Dep. 46:3–6.) In this letter, the recipient was told that failure to pay the check and all fees "will result in your case being reviewed for possible criminal prosecution." (Arons Decl. Ex. 4.)

If the check writer did not pay within fifteen days of the second letter, DATS "determine[d] if [the check writer] fit [the respective] county's guidelines for prosecution." (Craighead Dep. 49:2–7.) While

---

**5.** Of the twelve letters plaintiffs submitted, the only letter with a different letterhead is Exhibit 13, which replaced the District Attorney's name and title with that of the county's Chief of Police. (Arons Decl. Ex. 13.)

the guidelines for each county varied, they all indicated the statutory amounts for misdemeanors and felonies, required a minimum number of months remaining before the statute of limitations expired, and required a minimum level of identification of the check writer. (Arons Decl. Ex. 27 (DATS' pre-prosecution review guidelines for each county).) If the check did not fit the county's prosecution guidelines, DATS returned the check to the merchant. (Craighead Dep. 50:16.)

If DATS determined that the check writer fit the county's prosecution guidelines, DATS sent a third letter. (Pls.' Stmt. of Undisputed Facts # 48.) That letter states:

> You have been sent a series of letters giving you the opportunity to avoid possible criminal prosecution, as offered by the District Attorney through California Penal Code 1001.60 et al. We have attempted to work with you directly by phone and/or mail in resolving this serious criminal complaint submitted against you by the victim without success.

> You have not co-operated with our efforts and this letter is your notification that your banking account records will be ordered and upon receipt, your file will be sent to the District Attorneys [sic] office for review and the possible issuance of an arrest warrant for passing worthless checks under California Penal Code [section] 476a, depending upon the results of their investigation.

> If you wish to avoid this action with the possibility of being arrested and having a criminal record by paying ALL of the amounts that you have due and outstanding, you must call the District Attorney's Bad Check program immediately ... to place a stay on further criminal complaint processing [and pay in full].... Any further contact with you will be directly from the District Attor-

ney's Criminal Division Prosecution Unit.

(Arons Decl. Ex. 5.) If the check writer did not pay after the third letter, DATS' procedure was to request the individual's bank records and send the check, DATS' records, and any bank records to the local district attorney's office. (Craighead Dep. 184:3–16.) (*But see id.* at 184:10–25 (indicating that, for a reason unknown to Craighead, DATS requested Schwarm's bank records seven months after DATS' procedure suggested they should have been requested).)

Depending on the circumstances of a particular check writer's case, DATS also sent a variety of additional form letters to check writers that included similar statements as in its first three letters. (Arons Decl. Exs. 6–12, 16; Craighead Dep. 51:9–14.) For example, DATS had form letters if a check writer did not remit the full amount, DATS received two bad checks written by the same person, or DATS did not receive a promised payment. (Arons Decl. Exs. 9, 12.) DATS' employees also contacted check writers via telephone and allegedly followed a training script on such calls. (Craighead Dep. 157:12–25; *see also id.* (indicating that Craighead did not help create the script).)

For check writers who did not pay within fifteen days of the date of the first letter, DATS generally required the check writer to pay the $85.00 diversion fee and attend a diversion class that focused on financial management. (Arons Decl. Exs. 9, 12.) Diversion classes were held in each county whenever there were thirty-five people eligible to take the class. (Craighead Dep. 77:9–24.) When DATS sent a letter requiring a check writer to attend a diversion class, its computer system coded that check writer as having attended the class. If the check writer did not attend the class, DATS manually changed the code to reflect the individuals's non-attend-

ance and rescheduled the individual for the next class. (*Id.* at 78–82.)

Beginning in July 2004, plaintiff Kristy Schwarm began receiving demand letters from DATS' "Check Restitution/ Prosecution Program" for Mendocino County regarding two dishonored checks Schwarm wrote to Walmart and SaveMart for food and family goods. (Schwarm Decl. ¶¶ 3–4.) Between June 30, 2004 and May 11, 2005, DATS sent Schwarm the first three form letters described above and six additional letters, including one with the Mendocino Chief of Police listed in the letterhead. (*Id.* at ¶¶ 5, 7, 10.) DATS sent some of the letters after the one-year statute of limitations for misdemeanor bad check writing had passed and, after Schwarm filed bankruptcy, DATS sent her a letter informing her that "[b]ankruptcy cannot provide a shield or be used to cloak a crime when criminal sanctions are pending." (Pls.' Stmt. of Undisputed Facts # 9; Schwarm Decl. ¶ 10; Arons Decl. Ex. 13.) In its letters, DATS sought to collect a $10.00 bank fee for Schwarm's check to Walmart and a $5.00 bank fee for her check to SaveMart. (Arons Decl. Exs. 3–4.) Plaintiffs allege, however, that Walmart does not pay a bank fee for returned checks and that SaveMart's fee is only $0.55 per check. (*Id.* Ex. 29 at ¶ 8; Kline Dep. 13:13–24.) Schwarm did not learn that DATS, not the district attorney's office, sent the letters until she consulted a bankruptcy attorney in 2005. (Schwarm Decl. ¶¶ 6, 8.)

In December 2003, Plaintiff Patricia Foronda received DATS' First Notice from the "Madera County Check Restitution/Prosecution Program" based on a check she wrote to Rosenbalm Rockery for household supplies. (Foronda Decl. ¶ 10.) When Foronda contacted DATS at the number listed on the letter, she believed she was speaking with an employee of the district attorney's office and that she had to pay the amount requested to avoid arrest. (*Id.* at ¶ 2.) Although she paid the fees, including the $85.00 diversion fee, she did not attend the diversion class and was never pressured to do so. (*Id.*)

Plaintiff Josann Ancelet began receiving letters from DATS in October 2004 after she wrote a dishonored check to Target for household supplies. (Ancelet Decl. ¶ 1.) When Ancelet contacted DATS at the number listed on its letter and asked if she had contacted the district attorney's office, a DATS employee allegedly answered affirmatively. (*Id.* at ¶ 2.) Ancelet could not pay the full amount demanded at that time and was charged an additional $25.00 fee to pay in installments. (*Id.* at ¶ 3.) After paying the amount of the check and all requested fees, DATS also sent Ancelet a letter requiring her to attend a diversion class. (*Id.* at ¶ 4.) She did not attend the class and was never pressured to do so. (*Id.*)

On June 29, 2005, Schwarm filed a complaint, on behalf of herself and others similarly situated, alleging claims for 1) violations of the FDCPA; 2) violations of the Civil Rights Act, 42 U.S.C. § 1983, based on alleged procedural due process violations; 3) state constitutional procedural due process violations; 4) fraudulent misrepresentation; and 5) negligent misrepresentation.

On March 4, 2006, this court certified the case as a class action for "[a]ll persons who wrote checks in California to whom DATS mailed collection demands concerning dishonored checks, since June 29, 2003" and up until the date of the court's Class Certification Order. (Mar. 4, 2006 Order 20.)[6] The court named Schwarm as

---

**6.** The court also certified the following subclasses: "(1) all members of the umbrella class, from whom DATS attempted to collect, or collected money for checks written for personal, family, or household purposes,

the class representative and subsequently granted plaintiff's motion to add plaintiffs Ancelet and Foronda as class representatives.[7] (May 25, 2007 Order 5.)

After DATS filed Chapter 7 bankruptcy, this action was automatically stayed on August 18, 2006 pursuant to 11 U.S.C. § 362(a). On September 20, 2006, this court lifted the stay as to Craighead only.[8] (Sept. 20, 2006 Order 1.)

Plaintiffs now move for partial summary judgment, requesting: 1) a determination that Craighead is personally liable under the FDCPA; 2) class-wide declaratory relief that Craighead violated the FDCPA; 3) class-wide declaratory relief that Craighead violated class members' federal (via 42 U.S.C. § 1983) and state procedural due process rights; and 4) a determination of the amount of actual and statutory damages. Subsequent to oral argument on plaintiffs' motion for summary judgment, Craighead filed a cross-motion for summary judgment with respect to his liability under the FDCPA.

II. *Discussion*

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Alternatively, the movant can demonstrate that the non-moving party cannot provide evidence to support an essential element upon which it will bear the burden of proof at trial. *Id.*

Once the moving party meets its initial burden, the non-moving party "may not rely merely on allegations or denials in its own pleading," but must go beyond the pleadings and "by affidavits or as otherwise provided in [Rule 56,] set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548; *Valandingham v. Bojorquez*, 866 F.2d 1135, 1137 (9th Cir. 1989).

In its inquiry, the court must view any inferences drawn from the underlying facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court cannot engage in credibility determinations or weigh the evidence because these functions are reserved for the jury. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

---

since June 29, 2004; and (2) all members of the umbrella class from whom [defendants] attempted to collect, or collected money, since June 29, 2003." (*Id.*)

7. Schwarm sought to add Ancelet and Foronda as plaintiffs because, unlike Schwarm, they both paid fees demanded by defendants and thus had objectively verifiable damages. (Mot. for Leave to Amend Compl. 5.)

8. Because the action remains stayed against the remaining defendants, the court cannot enter an order that would detrimentally affect those defendants. *Dean v. Trans World Airlines, Inc.*, 72 F.3d 754, 756 (9th Cir.1995). This Order, therefore, is not the law of the case with regard to the remaining defendants potential liability and does not have a preclusive effect against them.

## A. *FDCPA*

In 1977, Congress enacted the FDCPA "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). The Act establishes a nonexclusive list of unlawful debt collection practices and provides for public and private remedies. *Id.* §§ 1692–1692p.

### 1. *Exceptions to FDCPA Coverage*

Effective October 13, 2006, Congress exempted qualifying private entities that contract with district attorneys to operate "bad check enforcement programs" from FDCPA liability. *Id.* § 1692p. Because DATS allegedly operated as such an entity prior to the effective date of the statute, Craighead can rely on the exemption only if § 1692p is subject to retroactive application.

 When, as with § 1692p, Congress did not expressly prescribe a statute's proper temporal reach, "the court must determine whether the new statute would have retroactive effect, i.e. whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). If a statute has a retroactive effect, the "traditional presumption teaches that [the statute] does

not govern absent clear congressional intent favoring such a result." *Id.* at 280.

 To determine whether a statute has a retroactive effect, "the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at 269–70, 114 S.Ct. 1483. The Ninth Circuit has explained that, under the *Landgraf* test, a statute has a retroactive effect if it "[t]ak[es] away a plaintiff's right to a remedy." *Scott v. Boos,* 215 F.3d 940, 947 (9th Cir.2000).

 Here, because applying § 1692p retroactively would potentially preclude plaintiffs from seeking relief under the FDCPA, the court finds that the statute has a retroactive effect. *See Dobbs v. Anthem Blue Cross & Blue Shield,* No. 04–02283, 2007 WL 2439310, at *3 (D.Colo. Aug.23, 2007) (finding a statute that enacted a new ERISA plan exemption had a retroactive effect because applying it retroactively "would materially alter the rights, duties, and liabilities of the parties").

Because § 1692p has a retroactive effect, it cannot exempt DATS unless there is a "clear congressional intent favoring such a result." *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483. With § 1692p, defendant cannot overcome the presumption against retroactive application of statutes because neither the statute nor its brief legislative history suggest that Congress intended the statute to apply retroactively. 15 U.S.C. § 1692p; S.Rep. No. 109–256, at 12 (2006), *reprinted in* 2006 U.S.C.C.A.N. 1219, 1231–32. Therefore, Craighead cannot rely on § 1692p to exempt DATS from the FDCPA.[9]

---

**9.** Even if Congress intended for § 1692p to apply retroactively, Craighead still could not avoid liability under the FDCPA pursuant to that section. To seek safe harbor under § 1692p, the private entity operating the bad check enforcement program must have complied with the state penal code sections that provide for such a program and collected

checks only after a district attorney found "probable cause of a [criminal] bad check violation." 15 U.S.C. § 1692p(c)(i), (c)(iv)(I). As discussed below, DATS did not comply with all of the BCDA provisions and there is a genuine issue of material fact as to whether a district attorney made the requisite probable cause determination.

Section 1692a(6)(C) of the FDCPA also exempts "any officer or employee of . . . any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties." 15 U.S.C. § 1692a(6)(C). This section exempts only "officers" or "employees," thus does not apply to private organizations that operate via a contract with the government. *Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1263 (9th Cir. 1996). Craighead, therefore, is not exempt from the FDCPA based on DATS' contract with the district attorneys' offices to operate pursuant to the BCDP.

2. *Personal Liability Under the FDCPA*

 To be liable under the FDCPA, a defendant must qualify as a "debt collector," which § 1692a defines as "any person who uses any instrumentality of interstate commerce . . . in any business the principal purpose of which is the collection of any debts,[10] or who regularly collects or

attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). The Staff Commentary on the FDCPA[11] explains that this definition includes "[e]mployees of a debt collection business, including a corporation, partnership, or other entity whose business is the collection of debts owed another."[12] 53 Fed.Reg. 50102 (Dec. 13, 1998).

When an employee of a debt collection corporation is also a shareholder, officer, or director of that corporation, there is a split of authority about whether the corporate form insulates the shareholder, officer, or director from personal liability under the FDCPA. Specifically, the Sixth Circuit and most district courts that have addressed the issue have held that the corporate structure does not insulate shareholders, officers, or directors from personal liability under the FDCPA. *Kistner v. Law Offices of Michael P. Margelefsky, L.L.C.*, 518 F.3d 433, 437–38 (6th Cir. 2008); *del Campo v. Kennedy*, 491

---

**10.** "[A] dishonored check is a 'debt' within the meaning of the FDCPA." *Charles v. Lundgren & Assocs., P.C.*, 119 F.3d 739, 742 (9th Cir.1997) (adopting the reasoning of *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316 (7th Cir.1994)); *see also* 15 U.S.C. § 1692a(5) (defining "debt" for purposes of the FDCPA). Therefore, plaintiffs' dishonored checks, which were written for personal, family, or household purposes as the FDCPA requires, constitute debts for purposes of the FDCPA. *Charles*, 119 F.3d at 742; *see also* 15 U.S.C. § 1692a(5) (defining "debt" for purposes of the FDCPA to include only an "obligation[s that] . . . are primarily for personal, family, or household purposes"); (Schwarm Decl. ¶ 3; Foronda Decl. ¶ 1; Ancelet Decl. ¶ 1).

**11.** A court " 'must give substantial deference to an agency's interpretation of its own regulations.' " *Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1263 (9th Cir. 1996) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)). The court's " 'task is not to decide which among several competing interpretations best serves the regulatory pur-

pose. Rather, the agency's interpretation must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." ' " *Id.*

**12.** Craighead does not dispute that DATS constitutes a "debt collection business." Craighead does argue that DATS is not subject to the FDCPA because it allegedly operated pursuant to criminal, not civil, state law. (Craighead's Mem. in Opp'n to Pls.' Mot. for Summ. J. 2:21–27, 7:4–7.) Besides the exception in § 1692p, however, the FDCPA does not distinguish whether a debt collection business operated pursuant to criminal or civil law. Therefore, DATS was a "business the principal purpose of which is the collection of . . . debts" as the FDCPA requires. 15 U.S.C. 1692a(6); *del Campo v. Kennedy*, 491 F.Supp.2d 891, 903 (N.D.Cal.2006) (holding that a private entity operating a bad check diversion program pursuant to a contract with the county district attorney is subject to the FDCPA).

F.Supp.2d 891, 903 (N.D.Cal.2006); *Brumbelow v. Law Offices of Bennett & Deloney, P.C.*, 372 F.Supp.2d 615, 618–21 (D.Utah 2005); *Albanese v. Portnoff Law Assocs., Ltd.*, 301 F.Supp.2d 389, 400 (E.D.Pa.2004); *Musso v. Seiders*, 194 F.R.D. 43, 46–47 (D.Conn.1999); *Brink v. First Credit Res.*, 57 F.Supp.2d 848, 861–62 (D.Ariz.1999); *Pikes v. Riddle*, 38 F.Supp.2d 639, 640 (N.D.Ill.1998); *Ditty v. CheckRite, Ltd.*, 973 F.Supp. 1320, 1337–38 (D.Utah 1997); *Newman v. Checkrite Cal., Inc.*, 912 F.Supp. 1354, 1372 (E.D.Cal. 1995); *Teng v. Metro. Retail Recovery Inc.*, 851 F.Supp. 61, 67 (E.D.N.Y.1994).

On the other hand, the Seventh Circuit has held that, regardless of an individual's personal involvement with the corporation's debt collecting activities, a shareholder or officer of a debt collecting corporation cannot be personally liable unless the plaintiff pierces the corporate veil. *White v. Goodman*, 200 F.3d 1016, 1019 (7th Cir.2000) (concluding that the corporate form protects shareholders from personal liability and that, in naming them, plaintiffs "should have been sanctioned for what amounts to malicious prosecution"); *Pettit v. Retrieval Masters Creditor Bureau, Inc.*, 211 F.3d 1057, 1059 (7th Cir. 2000) ("[U]nder ... *White v. Goodman*, the extent of control exercised by an officer or shareholder is irrelevant to determining his liability under the FDCPA."); *see also Ernst v. Jesse L. Riddle, P.C.*, 964 F.Supp. 213, 216 (M.D.La.1997) (noting that the FDCPA lacks language suggesting that "Congress intended the act to supplant state corporate law which generally limits then liability of a corporation's shareholders, officers, and directors ...").

While the Ninth Circuit has not yet addressed the issue, this court will adhere to the conclusion reached by the Sixth Circuit and the majority of district courts because it is more consistent with the FDCPA's broad language. The FDCPA expressly prohibits certain acts by "*any* person ... in *any* business." 15 U.S.C. § 1692a(6) (emphasis added). Without distinguishing between an employee's position within the corporation, the Staff Commentary also explains that "any person" includes an "employee of a *corporation.*" 53 Fed.Reg. 50102 (Dec. 13, 1998) (emphasis added). As the *Brumbelow* court explained, "[w]here Congress has chosen to use broad language, that language should be given its full effect no matter how sweeping." 372 F.Supp.2d at 619; *accord Pikes v. Riddle*, 38 F.Supp.2d 639, 640 (N.D.Ill.1998) ("[I]t is highly unlikely that Congress wished to restrict liability to the often small corporate vehicle used for collection, and the statutory language clearly brings all those personally involved within the ambit of 'debt collector.' ").

Moreover, in holding that a shareholder or officer cannot be personally liable unless the plaintiff pierces the corporate veil, the Seventh Circuit heavily relied on its analogy to Title VII and concluded that, similar to Title VII, the FDCPA imposes vicarious, not personal, liability. *Pettit*, 211 F.3d at 1059. Title VII, however, lacks the broad language Congress used in the FDCPA. Unlike the FDCPA's expansive coverage including "any person in ... any corporation," 15 U.S.C. § 1692a(6), Title VII applies only to a "covered entity," which it defines as "an employer, employment agency, labor organization, or joint-labor management committee." 42 U.S.C. § 12111(2); *Brumbelow*, 372 F.Supp.2d at 621–22; *accord Kistner v. Law Offices of Michael P. Margelefsky, L.L.C.*, 518 F.3d 433, 437 (6th Cir.2008). Contrary to the Seventh Circuit's reasoning, therefore, Congress' conspicuous inclusion of "any person" in the FDCPA and exclusion of such language from Title VII strengthens the conclusion that Congress intended that "any person" could be liable under the

FDCPA regardless of the protections state corporate law affords.

This conclusion is also consistent with circuit court decisions imposing personal liability on corporate shareholders, officers, and directors under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 6901–9675. Assuming the statutory conditions are satisfied, CERCLA allows the United States to seek reimbursement for cleanup efforts from "any person who at the time of disposal of any hazardous substance owned or operated any facility." *United States v. Bestfoods,* 524 U.S. 51, 55–56, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (citations omitted). CERCLA also defines "owner or operator" to include "any person" and defines "person" to include "an individual." 42 U.S.C. § 9601(20)(A), (21).

Because "Congress could have limited the statutory definition of 'person' [to exclude corporate shareholders and officers,] but chose not to," every circuit court that has addressed the issue has held that CERCLA imposes personal liability on shareholders, officers, and directors without requiring a plaintiff to pierce the corporate veil. *U.S. v. Ne. Pharm. & Chem. Co.,* 810 F.2d 726, 743–46 (8th Cir.1986); *accord*; *Carter–Jones Lumber Co. v. Dixie Distrib. Co.,* 166 F.3d 840, 846–47 (6th Cir.1999); *Bedford Affiliates v. Sills,* 156 F.3d 416, 431 (2d Cir.1998); *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 420 (7th Cir.1994); *Witco Corp. v. Beekhuis,* 38 F.3d 682, 692 (3d Cir.1994); *Riverside Market Dev. Corp. v. Int'l Bldg. Prods., Inc.,* 931 F.2d 327, 330 (5th Cir.1991).

The Supreme Court has similarly relied on CERCLA's expansive language in holding that "a corporate parent that actively participated in and exercised control over, the operations of [a polluting] facility itself may be held directly liable in its own right as an operator of the facility." *Bestfoods,* 524 U.S. at 55, 64–66, 118 S.Ct. 1876. The Court explained that, "[u]nder the plain language of the statute, any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution ... regardless of whether that person is the facility's owner." *Id.* (citation omitted).

Therefore, consistent with the district courts in this circuit that have addressed personal liability under the FDCPA and precedent addressing personal liability under CERCLA, this court concludes that a shareholder, officer, or director of a debt-collecting corporation may be held personally liable for FDCPA violations regardless of whether the plaintiff can pierce the corporate veil.[13]

---

**13.** Craighead attempts to distinguish the cases that found a shareholder or officer of a debt collecting corporation personally liable because, in most of the cases, the defendant debt collectors were attorneys. Craighead correctly notes that courts have emphasized that a defendant was an attorney when determining whether the defendant *violated* the FDCPA because "[a]buses by attorney debt collectors are more egregious than those of lay collectors." *Irwin v. Mascott,* 112 F.Supp.2d 937, 948 (N.D.Cal.2000); *see also Guerrero v. RJM Acquisitions L.L.C.,* 499 F.3d 926, 935 (9th Cir.2007) ("The statute as a whole thus suggests a congressional understanding that, when it comes to debt collec-

tion matters, lawyers and their debtor clients will be treated differently.... Congress did not view attorneys as susceptible to the abuses that spurred the need for the legislation to begin with, and ... Congress built that differentiation into the statute itself.") (citations omitted). (Craighead's Mem. in Opp'n to Pls.' Mot. for Summ. J. 8, 10:17–28.)

None of the cases, however, relied on a defendant's status as an attorney when determining whether the defendant could be *personally liable* under the FDCPA. The court, therefore, is unpersuaded that the line of cases finding personal liability without piercing the corporate veil is limited to attorney shareholders, officers, or directors.

■ Nonetheless, because the FDCPA imposes personal, not derivative, liability, serving as a shareholder, officer, or director of a debt collecting corporation is not, in itself, sufficient to hold an individual liable as a "debt collector." Regardless of the employee's rank within the company, § 1692a(6) requires that the individual "regularly collect[ed] or attempt[ed] to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). Based on this requirement, courts have found an individual personally liable if the individual 1) materially participated in collecting the debt at issue, *del Campo v. Kennedy*, 491 F.Supp.2d 891, 903 (N.D.Cal.2006); *Brink v. First Credit Res.*, 57 F.Supp.2d 848, 862 (D.Ariz.1999); 2) "exercise[d] control over the affairs of [the] business, *Piper v. Portnoff Law Assocs.*, 274 F.Supp.2d 681, 689–90; 3) was "personally involved in the collection of the debt at issue," *Musso v. Seiders*, 194 F.R.D. 43, 46 (D.Conn.1999); or 4) "was 'regularly engaged, directly and indirectly, in the collection of debts.'" *Kistner v. Law Offices of Michael P. Margelefsky, L.L.C.*, 518 F.3d 433, 438 (6th Cir.2008) (quoting *Ditty v. CheckRite, Ltd.*, 973 F.Supp. 1320, 1337 (D.Utah 1997)).

■ Under any of the aforementioned standards, the undisputed facts show that Craighead "regularly collect[ed] or attempt[ed] to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). DATS' collection activities at dispute in this case were its sole source of income, therefore, as a director and president, the only profit-generating activity Craighead oversaw was collecting debts pursuant to contracts with the district attorneys' offices. While Craighead allegedly did not draft the form collection letters DATS used, he was one of only three individuals that had final authority over DATS' collection procedures, which relied on the form letters. (Craighead Dep. 11:2–8); *see also*

*Albanese v. Portnoff Law Assocs., Ltd.*, 301 F.Supp.2d 389, 400 (E.D.Pa.2004) ("[T]he President … whose duties include supervising the staff and the overall operations of the firm, occupies the precise position that the *Pollice* court held was exposed to individual FDCPA liability …."). Craighead also developed the automated software DATS used and was solely responsible for managing and maintaining the automated computer system that implemented DATS' collection program. (Craighead Dep. 20:19–25.)

DATS also relied exclusively on Craighead to form relationships with merchants, negotiate contracts with the district attorneys' offices, and serve as merchants and district attorneys' offices' contact at DATS. (*Id.* at 20:12–13, 45:3–5, 140:10–12); Kline Dep. 22:6–14 (stating that she did not refer to DATS by its name, but knew it by the defendant's name, "Henry"). In negotiating the contracts with district attorneys' offices, Craighead also provided the district attorneys' offices with copies of DATS' collection letters. (Craighead Dep. 45:15–17.) Without Craighead, therefore, DATS would not have received bad checks and could not have attempted to collect the checks pursuant to the BCDA.

By his own admission, Craighead also "regularly interface[d] with clients, victims, and check writers" and "help[ed] administer" DATS' collection efforts. (Arons Decl. Ex. 2 (Craighead's Resp. to Pls.' Interrog. # 1)); *see also Newman v. Checkrite Cal., Inc.*, 912 F.Supp. 1354, 1372 (E.D.Cal.1995) (finding personal liability when the defendant was "directly involved in the day-to-day operation of [the debt collection business], including training and managing employees, and reviewing or supervising the review of all accounts"). In fact, Craighead does not identify a single responsibility he had at DATS that did not involve collecting debts. Accordingly,

the court finds that Craighead "regularly collect[ed] or attempt[ed] to collect, directly or indirectly, debts owed or due or asserted to be owed or due another," thereby qualifying him as a debt collector under the FDCPA and exposing him to personal liability under the FDCPA. 15 U.S.C. § 1692a(6).

### 3. *FDCPA Violations*

■ A debt collector's single action or procedure can give rise to multiple violations of the FDCPA. *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1177 (9th Cir.2006). To enter summary judgment in plaintiffs' favor with regard to Craighead's liability under the FDCPA, the court need only find a single violation. *See id.* § 1692k(a), (b)(2) (establishing liability for "any debt collector who fails to comply with any provision of this subchapter"). The court cannot, however, cease its inquiry upon finding one violation because, to award damages, the court must consider "the frequency and persistence of noncompliance by the debt collector [and] the nature of such noncompliance." *See* 15 U.S.C. § 1692k(a), (b)(2) (establishing liability for "any debt collector who fails to comply with any provision of this subchapter" and enumerating the factors the court must consider in awarding damages in class actions); *accord Chan v. N. Am. Collectors, Inc.*, No. 06-0016, 2006 WL 778642, at *3 (N.D.Cal. Mar.24, 2006).

■ When determining whether a debt collector violated the FDCPA, the court's focus is on the actions of the debt collector, not the debtor. *Freyermuth v. Credit Bureau Servs., Inc.*, 248 F.3d 767, 771 (8th Cir.2001). With the exception of the narrow bona fide error affirmative defense in § 1692k(c), the FDCPA imposes strict liability on debt collectors. *Clark*, 460 F.3d at 1176–77; *Irwin v. Mascott*, 112 F.Supp.2d 937, 963 (N.D.Cal.2000) (" 'The FDCPA is a strict liability statute and thus

does not require a showing of intentional conduct on the part of the debt collector.' ") (citations omitted). Still, the court must consider "the extent to which the debt collector's noncompliance was intentional" in awarding damages. 15 U.S.C. § 1692k(b)(2).

■ To determine whether a communication violates the FDCPA, the court must apply the "least sophisticated debtor" standard, which determines whether the communication is "likely to deceive or mislead a hypothetical 'least sophisticated debtor.'" *Terran v. Kaplan*, 109 F.3d 1428, 1431 (9th Cir.1997) (quoting *Swanson v. S. Or. Credit Serv., Inc.*, 869 F.2d 1222, 1225 (9th Cir.1988)). This "objective ... standard is 'lower than simply examining whether particular language would deceive or mislead a reasonable debtor.'" *Terran*, 109 F.3d at 1431–32 (citation omitted). Whether a communication would "confuse a least sophisticated debtor," thereby violating the FDCPA, is a question of law. *Id.* at 1432 (citation omitted). The least sophisticated debtor standard governs the court's evaluation of DATS' communications, which plaintiffs allege violate subsections of §§ 1692e and 1692f. *Guerrero v. RJM Acquisitions, L.L.C.*, 499 F.3d 926, 934 (9th Cir.2007) (stating that the least sophisticated debtor standard applies to violations of §§ 1692d, 1692e, and 1692f).

Plaintiffs allege that Craighead violated the FDCPA based on DATS' (a) use of district attorneys' names and titles in its letterheads; (b) statements that it would pursue criminal investigation, arrest, and prosecution; (c) collection of unauthorized fees; and (d) omission of FDCPA-required language. As discussed in more detail above, Craighead can be held personally liable for the FDCPA violations resulting from the content of DATS' letters and its collection of fees.

### a. Subsections 1692e(3), (9), (10), (14): Use of District Attorneys' Names and Titles

Plaintiffs contend that DATS' practice of including the name and title of the local district attorney in the letterhead of its collection letters violated several subsections of § 1692e, which define conduct that violates § 1692e's prohibition of a "false, deceptive, or misleading representation or means in connection with the collection of any debt." *Id.* § 1692e.

■ Subsection 1692e(3) prohibits the "false representation or implication that any individual is an attorney or that any communication is from an attorney." 15 U.S.C. § 1692e(3). "A debt collector violates this section of the FDCPA when a letter appears to be sent by an attorney without the attorney's having both reviewed the debtor's file and gained some knowledge about the specific debt." *Irwin v. Mascott,* 112 F.Supp.2d 937, 948–49 (N.D.Cal.2000) (citation omitted); *see also Avila v. Rubin,* 84 F.3d 222, 228 (7th Cir.1996) ("[A]n attorney sending dunning letters must be directly and personally involved in the mailing of the letters in order to comply with the strictures of FDCPA.").

■ Even though a district attorney did not sign any of DATS' form letters, the "least sophisticated debtor" could conclude that letters were from an attorney because all of the letters include the name and title of the county's district attorney. *See Newman v. Checkrite Cal., Inc.,* 912 F.Supp. 1354, 1382 (E.D.Cal.1995) (treating a letter where the attorney's name appears only in the letterhead the same as a letter signed by an attorney); *Greco v. Trauner, Cohen & Thomas, L.L.P.,* 412 F.3d 360, 364 (2d Cir.2005) ("[A] letter sent on law firm letterhead, standing alone, does represent a level of attorney involvement to the debtor receiving the letter.").[14]

■ Because the letters appear to be from a district attorney's office, § 1692e(3) requires that the respective district attorney reviewed each file and decided that DATS should send each collection letter to each particular debtor. *Newman,* 912 F.Supp. at 1382. The attorney's review must be thorough enough to amount to an "individualized investigation" of a particular debtor's case. *Id.* at 1382. For example, the *Irwin* court held that an attorney's review and notation on a spreadsheet that itemized each debtor's name, address, check amount, and merchant name was insufficient. *Irwin,* 112 F.Supp.2d at 950. The court concluded that "[t]he attorneys merely scanned the spreadsheets and the completed letters to satisfy some rote requirement that their eyes should fall on the documents before letters were sent out. The communications to check writers were not 'from' an attorney in any meaningful sense of the word." *Id.*

The undisputed facts show that the only review that may have occurred prior to DATS sending its initial letters was a district attorney's review of DATS' weekly check entry report. There is a genuine issue of material fact whether such a review actually occurred because Craighead testified in his deposition that DATS never proceeded without a response from the respective district attorney, (Craighead Dep. 9:19–22), but his August 23, 2005

---

14. The court recognizes that other statements in the letters, such as providing a telephone number with a 916 area code and a P.O. Box in Fair Oaks, California and stating that the debtor's file *"will be sent* to the District Attorney's Office for review" if the debtor does not pay, suggest that the letters are not from a district attorney's office. (Arons Decl. Ex. 5 (emphasis added).) While these facts may lead a reasonable debtor to conclude that the letters were not from a district attorney's office, they do not preclude the least sophisticated debtor from concluding that the letters were not from a district attorney's office.

letter states that DATS would perceive the district attorney's silence as approval to proceed. (Arons Decl. Ex. 28.) Further, neither party has produced evidence indicating the content of DATS' weekly check entry reports,[15] therefore, even if a district attorney reviewed each report and instructed DATS to proceed, the court cannot determine whether the reports contained sufficient information for the district attorney to perform a meaningful review.

Subsection 1692e(3)'s restrictions similarly apply to each letter DATS sent after its initial letter. *Irwin,* 112 F.Supp.2d at 949 ("[Section 1692e(3) is violated i]f the attorney did not first conduct an individual review of the debtor's case, *or* if the attorney did not determine if a particular letter should be sent ....") (emphasis added). It is undisputed that DATS continued its automated collection efforts with subsequent form letters without input from the respective district attorney's office. Therefore, Craighead is liable for DATS' practice of sending subsequent collection letters with the district attorney's name in the letterhead violated § 1692e(3) because a district attorney never reviewed a debtor's file and determined that DATS should send a particular letter. *See Clomon v. Jackson,* 988 F.2d 1314, 1321 (2d Cir.1993) ("[Using an attorney's letterhead and signature] was false or misleading because, [the attorney] played virtually no day-to-day role in the debt collection process— and certainly did not engage in any discussion with [the debt collectors] about how to collect [plaintiff's] debt."); *see also id.* ("[T]here will be few, if any, cases in which a mass-produced collection letter bearing the facsimile of an attorney's signature will comply with the restrictions imposed by § 1692e.").

Subsection 1692e(9) prohibits "[t]he use or distribution of any written communication ... which creates a false impression as to its source, authorization, or approval." 15 U.S.C. § 1692e(9). Similar to the court's conclusion that the least sophisticated debtor could conclude that DATS' letters were "from" a district attorney, it follows that such a debtor could also conclude that a district attorney's office issued, authorized, or approved the letters. *See also Gradisher v. Check Enforcement Unit, Inc.,* 210 F.Supp.2d 907, 914 (W.D.Mich.2002) (concluding that a collection agency had a contract with and was affiliated with a state agency violated § 1692e(9) when it sent letters on the agency's letterhead and omitted reference to itself). Craighead, therefore, is also liable under § 1692e(9).

Subsection 1692e(14) prohibits "[t]he use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization." 15 U.S.C. § 1692e(14). Craighead is liable under this subsection because none of DATS' letters used its true name (DATS) or the name it was registered as doing business under (CSS). Based on the court's preceding conclusions regarding subsections (3), (9), and (14), Craighead is also liable under § 1692e(10)'s more general prohibition against "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt ...." *Id.* § 1692e (defining the conduct subsections (3), (9), and (14) prohibit as using "any false, deceptive, or misleading repre-

---

**15.** Craighead contends the weekly submission included the merchant's Preliminary Bad Check Report and Request for Complaint, which includes a copy of the check and details about the transaction in which it was issued. (Craighead Decl. in Supp. of Mot. for Summ. J. Ex. 1.) The form Craighead submitted, however, is dated March 6, 2006, which was after plaintiffs filed this lawsuit and the class period closed.

sentation or means in connection with the collection of any debt").

b. *Subsections 1692e(4), (5): False Threats Without Intent*

■ Subsection 1692e(4) prohibits "[t]he representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person ... unless such action is lawful and the debt collector or creditor intends to take such action." *Id.* § 1692e(4). Similarly, § 1692e(5) prohibits "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken." *Id.* § 1692e(5). To determine whether a debt collector violated these subsections, the court must apply a two-pronged test evaluating (1) whether, from the perspective of the least sophisticated debtor, the debt collector threatened legal action or arrest; and (2) whether the debt collector could legally take such action and had the intent to do so. *Newman v. Checkrite Cal., Inc.,* 912 F.Supp. 1354, 1379 (E.D.Cal.1995).

■ Statements in debt collection letters may constitute threats to take legal action when they are "calculated to intimidate the least sophisticated consumer into believing that legal action against her is imminent" and "that the debtor's only options are either payment or being sued." *Irwin v. Mascott,* 96 F.Supp.2d 968, 971 (N.D.Cal.1999). The conditional nature of a statement, such as the use of the words "may" or "possible," does not negate the existence of a threat if a letter, in its entirety, could lead the least sophisticated debtor to believe that legal action is a real possibility. *See id.* at 951 ("The use of the word 'may' does not mitigate the tone of the letter which purports to be a 'formal notice' ...."); *see also Baker v. G.C. Servs. Corp.,* 677 F.2d 775, 779 (9th Cir. 1982) (upholding a district court's determination that a statement constituted a threat when it " 'create(d) the impression

that legal action by the defendant is a real possibility ...' ") (alteration in original).

■ In its first letter, DATS informed the debtor that a complaint had been submitted accusing the debtor of a violation of California Penal Code section 476a and that the only way "[t]o suspend this criminal investigation" was to submit information or pay the debt. (Arons Decl. Ex. 3.) The letter also explained that failure to respond to the notice "may result in further investigation with the possible issuance of a criminal complaint and ARREST warrant." (*Id.* (emphasis in original).) DATS' second letter, titled "FINAL NOTICE PRIOR TO REFERRAL FOR POSSIBLE ARREST WARRANT," indicated that the debtor's failure to pay "will result in your case being reviewed for possible criminal prosecution." (*Id.* Ex. 4 (emphasis in original).) In its third letter, DATS referenced the "serious criminal complaint" submitted against the debtor and explained that, if the debtor did not pay, DATS would order the debtor's bank records and the debtor's "file will be sent to the District Attorney's Office for review and possible issuance of an arrest warrant ...." (*Id.* Ex. 5.)

The three letters DATS primarily used and the remainder of its letters before the court convey the common theme that the debtor's failure to pay could result in criminal investigation, arrest, and prosecution. Under the least sophisticated debtor standard, this court finds that the statements in DATS' letters constitute threats of legal action or arrest under § 1692e(4)-(5).

Still, the letters violate subsections (4) and (5) only if DATS could not legally take the threatened action or did not intend to take the threatened action. To determine whether DATS could legally initiate criminal investigations, arrests, or prosecutions, the court must look to state law. *Newman v. Checkrite Cal., Inc.,* 912 F.Supp. 1354,

1380 (E.D.Cal.1995). Craighead identifies only California's BCDA as authorizing DATS' threats in its letters. Not only does the BCDA allow DATS to reference potential legal action in a notice pursuant to the BCDA, it requires that such a notice include "[a] statement of the penalty for issuance of a bad check." Cal.Penal Code § 1001.63(d).

Nonetheless, while the BCDA authorizes a diversion letter to describe the penalty a bad check writer may face, DATS' program suffered a more fundamental deficiency—DATS did not ensure that it sent letters only to *"bad* check" writers as the BCDA contemplates. Specifically, section 1001.60 of the BCDA establishes that the program applies only to "persons who write bad checks" and explains that " 'writing a bad check' means making, drawing, uttering, or delivering any check or draft upon any bank or depository for the payment of money where there is probable cause to believe there has been a violation of [Penal Code] Section 476a." Cal.Penal Code § 1001.60; *see also id.* § 476a (criminalizing willfully issuing a bad check with the intent to defraud). The BCDA, therefore, can authorize DATS to send a letter to an individual only if there is probable cause to believe the individual violated section 476a.

Thereafter, even if an individual qualifies as a bad check writer, the district attorney, not a private entity conducting the program, must still determine whether to refer a particular case to the program. *Id.* § 1001.62. To "determine if [a] case is one which is appropriate to be referred to a bad check diversion program, the district attorney must consider five factors:

(a) The amount of the bad check. (b) If the person has a prior criminal record or has previously been diverted. (c) The number of bad check grievances against the person previously received by the district attorney. (d) Whether there are other bad check grievances currently pending against the person. (e) The strength of the evidence, if any, of intent to defraud the victim."

*Id.* § 1001.62.

With respect to the requisite probable cause determination, plaintiffs first contend that section 1001.60 requires a district attorney to determine that probable cause exists to believe an individual violated section 476a. *Id.* § 1001.60. While the FDCPA requires a district attorney to make such a finding to come within § 1692p's exception, the BCDA does not explicitly require the district attorney to make the probable cause determination. In fact, the BCDA appears to presume that the probable cause determination will have been made before a district attorney receives a bad check. *See id.* § 1001.60 (defining "writing a bad check" to include only debtors where there is probable cause to believe they violated section 476a); *id.* § 1001.62 ("On receipt of a *bad check case,* the district attorney shall . . . ."). Therefore, under the BCDA's statutory framework, a merchant could make the requisite probable cause determination. *See People v. Mack,* 66 Cal.App.3d 839, 845, 136 Cal. Rptr. 283 (1977) ("There is nothing inherent in the process of determining probable cause that renders it beyond the capacity of lay persons to resolve.") (citing *Shadwick v. City of Tampa,* 407 U.S. 345, 351–52, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972)).

It is undisputed that, at least in some cases, the merchants informed a check writer that a check was returned due to insufficient funds and attempted to collect payment from the check writer prior to submitting the check to DATS. (Shonts Dep. 14–17.) In those cases, the merchants could have made the probable cause finding that the BCDA requires. *Morris v. Moore,* 61 Cal.App. 314, 318–19, 214 P. 995 (1923) (finding probable cause of intent

to defraud when a check writer received notice that the check was dishonored and failed to pay or provide an explanation). If, however, a merchant did not attempt to collect a check prior to submitting it to DATS, the merchant could not have made the requisite probable cause finding. *See Edgerly v. City & County of San Francisco*, 495 F.3d 645, 651 (9th Cir.2007) ("Generally, officers need not have probable cause for every element of the offense [to make a warrantless arrest], but they must have probable cause for specific intent when it is a required element.").

In cases where a merchant could not have made the requisite probable cause finding, only the district attorney could have made the determination. Specifically, section 1001.60 uses the probable cause limitation to define the universe of cases that may be considered for the program and section 1001.62 establishes that, of those who may be considered for the program, only the district attorney may refer them to the program. *See* Cal.Penal Code § 1001.62 ("On receipt of a *bad check case*, the district attorney shall ...."). Therefore, because only the district attorney may refer a case to the program, a private entity conducting the program cannot make the probable cause determination that the statute presumes will occur *prior to* referral. *See People v. Jenkins*, 10 Cal.4th 234, 246, 40 Cal.Rptr.2d 903, 893 P.2d 1224 (1995) ("In determining [the Legislature's] intent, we consider the statute read as a whole, harmonizing the various elements by considering each clause and section in the context of the overall statutory framework. We must select the construction that comports most closely with the apparent intent of the Legislature ... and avoid an interpretation that would lead to absurd consequences.") (internal citations omitted).

As discussed above, the court lacks sufficient evidence to determine that a merchant or district attorney made the requisite probable cause determination. The court also lacks sufficient evidence to determine, as a matter of law, that a district attorney considered the requisite BCDA factors. Therefore, there is a genuine issue of material fact with respect to whether the BCDA authorized DATS' threats.

Regardless, even if the BCDA authorized DATS to take the actions it threatened, Craighead can still be liable under § 1692e(4) because DATS lacked the intent to take the threatened actions at the time it sent many of its letters. Craighead testified in his deposition that DATS reviewed a debtor's file to determine if it satisfied the prosecutor's guidelines after DATS sent its first two collection letters. (Craighead Dep. 49:2–7, 50:16.) Therefore, DATS sent letters threatening legal action and arrest to many debtors when DATS never intended to send the files to the respective district attorneys' offices because the debtors' files did not meet the minimum requirements for referral. *See Irwin v. Mascott*, 112 F.Supp.2d 937, 952 (N.D.Cal.1999) ("A false threat to take action may be established by showing that no assessment has been made as to whether the threat will be carried out.") (citation omitted); *see also Newman v. Checkrite Cal., Inc.*, 912 F.Supp. 1354, 1380–81 (E.D.Cal.1995) (finding that a defendant lacked intent to file suit in California because he was not a member of the California bar at the time he sent the letter and that a second defendant lacked intent to file a lawsuit because none of the plaintiffs fell within the defendant's criteria for filing a lawsuit). As to subsequent letters, the court lacks sufficient evidence to determine that DATS intended to carry out the threatened actions.

Accordingly, Craighead is liable under § 1692e(4)-(5) based on DATS' threats in its first two letters.

### c. Subsections 1692f(1) and 1692e(2): Collection of Unauthorized Fees

Section 1692f prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt," which includes "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1). To establish that a particular fee does not violate § 1692f(1), the debt collector must identify a state law that authorizes the fee. *Newman*, 912 F.Supp. at 1367–68.

 Craighead contends that the BCDA authorized the fees DATS charged.[16] Plaintiffs argue, however, that section 1001.65 did not authorize the fees DATS collected because DATS did not comply with the BCDA's requirements and, even if the BCDA authorized DATS to collect fees despite its non-compliance, it collected fees in excess of those section 1001.65 authorized.

If a debtor elects to enter diversion, section 1001.65 of the BCDA authorizes the district attorney, or a private company contracting with the district attorney pursuant to the BCDA, to collect two fees: 1) a processing fee not to exceed $35.00 for each bad check; and 2) actual bank charges not exceeding $10.00, which must be paid to the victim. Cal.Penal Code § 1001.65(a), (c); *see also id.* § 1001.65(b) (allowing a judge to award additional fees after a criminal conviction).

As discussed above, there is a genuine issue of material fact with respect to the involvement, if any, of the respective district attorney's office prior to DATS' initiation of collection efforts. Because the court cannot determine that DATS functioned pursuant to the BCDA and plaintiffs have not shown that the BCDA requires complete compliance to authorize fees, the court cannot determine, as a matter of law, that the BCDA authorized DATS to collect fees. Therefore, the court cannot enter summary judgment with respect to the $35.00 processing fee and actual bank charges paid to the victim.

 With certain debtors, however, DATS collected three fees that the BCDA did not authorize: 1) an $85.00 diversion fee; 2) a $25.00 finance fee if a debtor elected to pay in installments; and 3) bank fees in excess of what a bank actually charged a merchant.[17] Therefore, Craighead is liable under § 1692f(1) based on DATS' collection of the three aforementioned fees.

DATS' collection of unauthorized fees also violated § 1692e(2) (A)-(B), which prohibits "[t]he false representation of—(A)

---

**16.** To the extent Craighead argues that California Penal Code section 476a authorized the fees DATS collected, his argument is without merit. Section 476a authorizes only a "sheriff's department, police department, or other law enforcement agency" to collect a $25.00 processing fee and bank charges incurred by the victim if the check was referred to its agency for investigation of an alleged violation of section 476a. Cal.Penal Code § 476a(g).

**17.** With regard to bank fees, the only evidence plaintiffs submitted shows that DATS charged Schwarm a $10.00 bank fee for her check to Walmart and a $5.00 bank fee for her check to SaveMart even though Walmart did not pay a bank fee for returned checks and SaveMart's fee was only $0.55. (Arons Decl. Exs. 3–4; Perea Decl. ¶ 8; Kline Dep. 13:13–24.) Plaintiffs also argue that DATS charged $10.00 bank fees for Certegy checks and that, as a check guarantee company, Certegy did not incur bank fees. (Pls.' Mem. in Supp. of Mot. for Summ. J. 23:12–15.) Plaintiffs do not, however, offer evidence to support this statement or show that Certegy did not collect merchants' bank fees to reimburse the merchants. Based on this limited evidence, the court cannot determine the amount of bank fees DATS charged in excess of those actually incurred by the merchant.

the character, amount, or legal status of any debt; or (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt." 15 U.S.C. § 1692e(2) (A)-(B); *see also Newman,* 912 F.Supp. at 1367 (collapsing its analysis defendants' violations of §§ 1692f(1) and 1692e (2)(A)-(B)).

d. *Subsections 1692e(11), 1692g(a): Omission of Required Language and Validation Notices*

■ In the initial communication with a debtor, § 1692e(11) requires the debt collector to include a statement that it "is attempting to collect a debt and that any information obtained will be used for that purpose . . . ." 15 U.S.C. § 1692e(11). In its first letter, DATS included the requisite language, therefore Craighead is not liable under § 1692e(11).

■ As the Ninth Circuit has summarized, § 1692g(a) also requires that the initial debt collection communication contain:

(1) the amount of the debt; (2) the name of the creditor; (3) a statement that if the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector; (4) a statement that if the consumer disputes the debt, the debt collector will mail the consumer verification of the debt or a copy of a judgment; and (5) a statement that, upon the consumer's written request, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

*Terran v. Kaplan,* 109 F.3d 1428, 1430 (9th Cir.1997); 15 U.S.C. § 1692g(a). While DATS' first letter in its series contains the first two requirements, it does not contain the statements detailed in the third through fifth requirements. Therefore, Craighead is liable under § 1692g(a) based on DATS' omission of the last three requirements.

■ Subsection 1692e(11) also requires that, in any "subsequent communication," the debt collector must disclose "that the communication is from a debt collector." 15 U.S.C. § 1692e(11).[18] Of the eleven subsequent communications plaintiffs provided in support of their motion, only two include the requisite disclosures that the communications are from a debt collector. The remaining nine omit any reference to debt collection and, for example, refer to the delinquent amount as "restitution," (Arons Decl. Exs. 4, 8, 9, 11–12), state that

---

**18.** In *Pressley v. Capital Credit & Collection Serv., Inc.,* 760 F.2d 922 (9th Cir.1985), the Ninth Circuit held that § 1692e(11)'s requirements do not apply to a "follow up notice which only demands a payment as earlier requested" so long as there is no evidence that the debt collector's communications were abusive, false, deceptive, or misleading. *Id.* at 925. The court reasoned that a follow up notice did not constitute a "communication" as used in § 1692e(11). *Id.* The court's decision, however, was based on a prior version of § 1692e(11). *Id.* Unlike the prior version, which applied to "all communications," Congress amended subsection (11) in 1996 to differentiate between "initial" communications and "subsequent" communications. 15 U.S.C. § 1692e(11). The 1996 amendment also limited the requisite disclosure for subsequent communications to include only that the communication is from a debt collector. This limitation is consistent with the Ninth Circuit's reasoning that Congress did not intend for the full disclosure the pre–1996 version of subsection (11) required to be in every subsequent communication. *Id.* Therefore, in light of the 1996 amendments to § 1692e(11), the Ninth Circuit's holding that § 1692e(11) does not apply to follow up notices is no longer good law. *But see Newman v. Checkrite Cal., Inc.,* 912 F.Supp. 1354, 1381 (E.D.Cal.1995) (applying *Pressley* to disclosures required by § 1692g(b) and recognizing other circuits' pre–1996 criticism of *Pressley* ).

the letters are giving the check writer "the opportunity to avoid possible criminal prosecution," (*id.* Ex. 5), or state that "criminal sanctions are pending." (*Id.* Ex. 13.) One letter even negates the requisite language, stating: "This is not a Civil issue under 15 USC 1692e requiring the following statement; 'This is an attempt to collect a debt and any information obtained will be used for that purpose.' This is a Criminal issue under Penal Code 476a." (*Id.* Ex. 8.) Craighead, therefore, is liable under § 1692e(11) based on DATS' subsequent letters that omit the requisite FDCPA language.

### 4. *FDCPA Damages*

Based on a single violation of the FDCPA, a plaintiff is entitled to:

(1) any actual damage sustained by such person as a result of such failure;

(2) ... (B) in the case of a class action, (I) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector; and

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court....

15 U.S.C. § 1692k(a). To award damages under the FDCPA, the court must consider "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, the resources of the debt collector, the number of persons adversely affected, and the extent to which the debt collector's noncompliance was intentional." *Id.* § 1692k(b)(2).

The only evidence plaintiffs submitted with respect to damages was the total fees DATS collected between July 1, 2003 and September 30, 2005, including a monthly average for the twelve months prior to plaintiff's filing of their motion for summary judgment. (Pls.' Mem. in Supp. of Mot. for Summ. J. 49:15–20–50:1–4.) The court cannot award damages based only on the fees DATS collected because such as an award fails to account for the factors the FDCPA requires the court to consider and presumes that the fees *DATS* collected in violation of the FDCPA equate to the damages the court should award against *Craighead.*[19] Therefore, because plaintiffs have not submitted sufficient evidence, the court must deny plaintiffs' motion for summary judgment with respect to a determination of damages.

### B. *42 U.S.C. § 1983 Claims*

Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights that are conferred elsewhere. *Graham v. Connor,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Section 1983 imposes personal liability and requires that the defendant was personally involved in the alleged constitutional violations. *Jones v. Williams,* 297 F.3d 930, 934 (9th Cir.2002). While it does not impose vicarious liability, a supervisor can be "liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989). Based on the court's discussion with respect to Craighead's personal liability under the FDCPA, the court finds that he can be personally liable for

19. Such calculations are also insufficient because, as discussed above, there are genuine issues of material fact with regard to amount of the fees DATS collected in violation of the FDCPA.

any constitutional violations resulting from DATS' automated collection procedures and letters.

 For the court to enter summary judgment in favor of plaintiffs on their § 1983 claims, plaintiffs must show that Craighead (1) acted under color of state law and (2) deprived plaintiffs of rights secured by the Constitution or a federal statute. *Gibson v. United States,* 781 F.2d 1334, 1338 (9th Cir.1986). "Private parties act under color of state law if they willfully participate in joint action with state officials to deprive others of constitutional rights." *United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1540 (9th Cir.1989) (citations omitted); *accord Franklin v. Terr,* 201 F.3d 1098, 1100–01 (9th Cir.2000). It is undisputed that Craighead acted under color of state law. To satisfy the second element of their § 1983 claims, plaintiffs do not argue that the rights of which they were deprived were those conferred by the FDCPA. Rather, plaintiffs argue that Craighead deprived them of their Fourteenth Amendment procedural due process rights.

 " 'To establish a violation of procedural due process a plaintiff must demonstrate: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections.' " *Tutor–Saliba Corp. v. City of Hailey,* 452 F.3d 1055, 1061 (9th Cir.2006) (quoting *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.,* 149 F.3d 971, 982 (9th Cir.1998)). The procedural due process requirements under the Cali-

fornia Constitution closely follow the federal requirements except that California does not require a plaintiff to "establish a property or liberty interest as a prerequisite to invoking due process protection." *Ryan v. Cal. Interscholastic Fed'n–San Diego Section,* 94 Cal.App.4th 1048, 1069, 114 Cal.Rptr.2d 798 (2001) (citation omitted); *accord Toussaint v. McCarthy,* 801 F.2d 1080, 1097 (9th Cir.1986). This distinction does not alter the analysis in this case because it is undisputed that money constitutes a property interest protected by the Fourteenth Amendment. *Board of Regents v. Roth,* 408 U.S. 564, 571–72, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Therefore, to be entitled to summary judgment on their federal and state due process claims, plaintiffs must show that Craighead deprived them of money without due process of law.

 A deprivation of property does not occur when individuals voluntarily relinquish their property rights. *See Ulrich v. City & County of San Francisco,* 308 F.3d 968, 974 (9th Cir.2002). As three district courts have recognized, "[c]heck writers who receive a [DATS] letter of notice are given two options: (1) enroll in the program and pay the check amount plus program fees, or (2) not enroll in the program and face the possibility of a criminal proceeding conducted in accordance with due process." *Hamilton v. Am. Corrective Counseling Servs., Inc.,* No. 3:05–434, 2006 WL 3332828, at *4 (N.D.Ind. Nov.14, 2006); *del Campo v. Kennedy,* 491 F.Supp.2d 891, 902 (N.D.Cal.2006); *Gradisher v. County of Muskegon,* 255 F.Supp.2d 720, 728 (W.D.Mich.2003).[20]

---

**20.** In their fifty-two-page memorandum of points and authorities in support of their motion for summary judgment, plaintiffs neglect to mention that three district courts have rejected, *on motions to dismiss,* due process claims attacking substantially similar bad check diversion programs. Even more disturbing to the court than this omission is the fact that, of plaintiffs' five counsel in this case, four of the attorneys were counsel for the plaintiffs in one or more of the three aforementioned cases. Plaintiffs' counsel's conscious decision not address, let alone cite, the only cases directly on point shocks the conscience of this court.

Therefore, unlike cases where the government garnishes a plaintiff's wages or levies the plaintiff's bank account, plaintiffs in this case voluntarily sent payments to DATS. *See, e.g., Sniadach v. Family Fin. Corp. of Bay View,* 395 U.S. 337, 341–42, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (prejudgment garnishment of wages without a hearing violated due process).

 Nonetheless, plaintiffs argue that even though their physical act of sending payments to DATS was voluntary, they did not voluntarily relinquish their property interests because DATS' misrepresentations coerced plaintiffs to send the payments. Instead of identifying allegedly false or misleading statements to support their argument, however, plaintiffs state in conclusory terms that DATS' "collection letters speak for themselves." (Pls.' Mem. in Supp. of Mot. for Summ. J. 36 n. 13.) This reasoning attempts to elevate the FDCPA's detailed debt collection prohibitions to due process violations. Just because a letter is found misleading under the FDCPA's expansive definitions and the least sophisticated debtor standard, it does not follow that the same letter is misleading or false for purposes of procedural due process.[21]

When viewed outside the context of the FDCPA, DATS' letters were not false, misleading, or coercive. Specifically, the use of the district attorney's name in the letterhead was not false or misleading because DATS' contract with the respective district attorney's office provided that DATS would serve "as a direct representative of [the district attorney.]" (Arons Decl. Ex. 19 at ¶ 1.4.) DATS' statements about potential criminal investigation, arrest, and prosecution were also not false or misleading because all of the statements were conditional and the district attorney's office had the authority to begin criminal investigations with regard to whether the particular debtor violated California Penal Code section 476a. Overall, while DATS' form letters are far from model BCDA letters—as evidenced by the multitude of FDCPA violations—they do not amount to coercion under the due process clause. *See Gradisher v. County of Muskegon,* 255 F.Supp.2d 720, 728–30 (W.D.Mich.2003) (concluding, after a detailed review of the language in the collection letters, that language substantially similar to the language in DATS' collection letters was not false and misleading for purposes of the due process clause).

Accordingly, because DATS' letters did not transform plaintiffs' voluntary remission of payments to involuntary deprivations of property, Craighead did not deprive plaintiffs of their property interests.

 Furthermore, even if the content of DATS' letters effectively deprived plaintiffs of their property interests, the deprivations were not without due process of law. Procedural due process is a "flexible [concept] and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). "The essential requirements of due process, . . . are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be

---

**21.** Plaintiffs also inform the court that it "can draw upon the experience of other courts that have examined the collection notices sent by District Attorney Bad Check Diversion programs." (Pls.' Mem. in Supp. of Mot. for Summ. J. 36 n. 13.) All of the cases plaintiffs cite, however, are factually and legally distinguishable. *See, e.g., In re Byrd,* 256 B.R. 246, 253 (Bankr.E.D.N.C.2000) (addressing a bad check diversion program in which the debtor was required to pay the restitution to be *released from jail*); *In re Reisen,* No. 03–1999, 2004 WL 764628, at *4–5 (Bankr.N.D.Iowa 2005) (determining whether a bad check diversion program is a prosecution or debt collection *for purposes of an automatic stay*).

taken is a fundamental due process requirement." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

■■■■ To determine whether plaintiffs were provided sufficient process, the court must apply the *Matthews'* balancing test, which examines "(1) the private benefits that will be terminated, (2) the decreased probability of erroneous deprivation of benefits with additional procedural safeguards and, balanced against (1) and (2), (3) the cost to the government and the public of additional procedural safeguards." *Belnap v. Chang,* 707 F.2d 1100, 1103 (9th Cir.1983) (citing *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).[22]

■■■ First, unlike liberty and property interests that the Supreme Court has deemed significant or essential, *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 543, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (interest in retaining employment); *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 19, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (loss of electricity service), plaintiffs' property interests at stake—the amount of their checks plus fees ranging between $40.00 to $155.00—are "relatively minimal." *Gradisher v. County of Muskegon,* 255 F.Supp.2d 720, 730–31 (W.D.Mich. 2003); *Hamilton v. Am. Corrective Coun-*

*seling Servs., Inc.,* No. 3:05–434, 2006 WL 3332828, at *5 (N.D.Ind. Nov.14, 2006) (same).

With regard to the second factor, plaintiffs argue that the process was insufficient because "it did not provide plaintiffs with a procedure to challenge the legality of the collection fees before a neutral decision-maker." (Pls.' Mem. in Supp. of Mot. for Summ. J. 39:4–7 (citing *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco, Dep't of Bus. Regulation of Fla.,* 496 U.S. 18, 39 n. 21, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990).) When addressing whether the government provided sufficient process with tax exactions, however, the Supreme Court explained that "[t]he State may choose to provide a form of 'predeprivation process,' for example, ... by allowing taxpayers to withhold payment and then interpose their objections as defenses in a tax enforcement proceeding initiated by the State." *McKesson Corp.,* 496 U.S. at 36–37, 110 S.Ct. 2238. Here, plaintiffs were given this option in DATS' initial letter:

> If you feel that you have information that has an important bearing on [DATS'] investigation [of the bad check complaint], such as a Police report, Bank statement or other such documents, you must contact this office Monday through Friday between the hours of 9:00AM

---

**22.** Under the California Constitution, the court must balance "the private interest that will be affected by the individual action; the risk of an erroneous deprivation of this interest through the procedures used and the probable value, if any, of additional or substitute safeguards; the dignitary interest of informing individuals of the nature, grounds and consequences of the action and of enabling them to present their side of the story before a responsible governmental official; and the government interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Oberholzer v. Comm'n on Judicial Performance,* 20 Cal.4th 371, 390–91, 84 Cal.Rptr.2d 466, 975 P.2d 663 (1999) (citations omitted). "[O]ther than the addition of the dignity factor, the [California] balancing test for determining what procedural protections are warranted, given the governmental and private interests involved, is essentially identical to that employed under the federal analysis." *Ryan v. Cal. Interscholastic Fed'n–San Diego Section,* 94 Cal.App.4th 1048, 1071–72, 114 Cal. Rptr.2d 798 (2001) (citation omitted). Plaintiffs have not argued that DATS' collection procedures implicate a dignitary interest that dictates a different result for purposes of their state due process claims.

and 4:00PM only, at (916) 722–3009. To suspend this criminal investigation you must either provide the afore mentioned [sic] documents or mail a "Money Order or Cashiers Check" for the total amount due . . . .

(Arons Decl. Ex. 3.) DATS' letter, therefore, specifically provided a check writer with an opportunity to contact DATS and provide any information disputing the alleged bad check. As due process requires, the letter was " 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *Gete v. I.N.S.*, 121 F.3d 1285, 1297 (9th Cir.1997) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).

DATS' letter also gave a check writer the option of declining to enter the diversion program and allowing the district attorney's office to pursue an investigation and possibly a full trial—which would afford due process. The debtor's option also negates a claim that DATS deprived the debtor of his or her property because, once the debtor declined to enter diversion, the BCDA's fees were no longer collectable. *See* Cal.Penal Code § 1001.60(a) (authorizing a judge to impose a collection fee only after conviction).

With respect to the third factor, counties have "a legitimate interest in resolving bad check complaints without draining judicial resources and minimizing the administrative costs associated with such violations." *Hamilton v. Am. Corrective Counseling Servs., Inc.*, No. 3:05–434, 2006 WL 3332828, at *5 (N.D.Ind. Nov.14, 2006). Implementing their programs through independent contractors allows counties to accomplish this interest without expending significant funds for what may amount to comparatively minor violations of the penal code. *Gradisher v. County of Muskegon,*

255 F.Supp.2d 720, 730–31 (W.D.Mich. 2003). Requiring a hearing, extensive investigation, or personalized collection letters for each case would increase the costs of such a program so that it would become impracticable or require the debtor to pay exorbitant fees. *Id.* Therefore, in light of the interests enumerated in *Mathews*, plaintiffs fail to show that they were not afforded sufficient due process.

Relying on *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) and its progeny, plaintiffs also argue that Craighead violated their due process rights because he had a substantial financial interest in maintaining a high rate of collections. In *Tumey*, the Supreme Court held that a criminal defendant is deprived of due process if the *judge* has a "direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case." *Id.* at 523, 47 S.Ct. 437 (emphasis added). As the Supreme Court has made clear, "[t]he rigid requirements of *Tumey* and *Ward [v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), were] designed for officials performing judicial or quasi-judicial functions." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980). Craighead did not perform a judicial or quasi-judicial function, therefore, plaintiffs cannot rely on the line of cases addressing only judicial or quasi-judicial functions.

While the Supreme Court has not directly applied *Tumey* to prosecutors, it has explained that "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." *Marshall,* 446 U.S. at 249–50, 100 S.Ct. 1610. Again, however, plaintiffs' reliance on the restrictions placed on prosecu-

tors is misplaced because, while Craighead helped implement a diversion program pursuant to contracts with district attorneys' offices, he did not exercise power akin to prosecutorial discretion. *See Gallego v. McDaniel,* 124 F.3d 1065, 1079 (9th Cir.1997) ("In *Marshall,* the Supreme Court observed that a prosecutor's direct pecuniary interest in the outcome of a case *that has an impact on the prosecutor's decision whether or not to enforce a particular statute* may have constitutional ramifications.") (emphasis added).

Specifically, DATS' automated program established that any discretion remained with the respective district attorney because only the district attorney could decide not to pursue diversion with a particular debtor. Similarly, only the district attorney could elect to pursue criminal charges if a check writer did not elect to pursue diversion. If a debtor chose not to pursue diversion, DATS' only option was to refer the check to the district attorney if it satisfied the applicable guidelines or return it to the merchant if it did not. Under no circumstances did DATS have the discretion or "authority to deprive check writers of their property." *Hamilton v. Am. Corrective Counseling Servs., Inc.,* No. 3:05–434, 2006 WL 3332828, at *6 (N.D.Ind. Nov.14, 2006). The line of cases addressing potential due process concerns when a prosecutor has a financial interest, therefore, is also inapplicable to Craighead.

Lastly, plaintiffs rely on two state court decisions that held it unconstitutional for a prosecutor to withhold a pretrial diversion program from an *indigent* defendant solely because the defendant was unable to pay a fee or fine. *Mueller v. State,* 837 N.E.2d 198, 205 (Ind.App.2005); *Moody v. State,* 716 So.2d 562, 565 (Miss.1998). The court need not address the merit of those decisions because plaintiffs have neither alleged nor offered evidence showing that any of the plaintiffs were indigent. *See Mueller,* 837 N.E.2d at 205 ("It is unclear from the record whether the trial court here made a final determination as to whether [the defendants] were, in fact, indigent with respect to paying the fees, and we remand for consideration of that issue.").

Accordingly, because plaintiffs fail to show any facts suggesting that Craighead violated their procedural due process rights, the court must deny their motion for summary judgment with respect to their federal and state constitutional claims.

IT IS THEREFORE ORDERED that:

(1) plaintiffs' motion for summary judgment with respect to Craighead's violations of §§ 1692e(2)-(5), (9)-(11), (14), 1692f(1), 1692g(a) of the FDCPA be, and the same hereby is, GRANTED;

(2) Craighead's motion for summary judgment with respect to his liability under the FDCPA be, and the same hereby is, DENIED;

(3) plaintiffs' motion for summary judgment with respect to statutory and actual damages be, and the same hereby is, DENIED; and

(4) plaintiffs' motion for summary judgment with respect to their claims for violations of federal and state procedural due process be, and the same hereby is, DENIED.